**PARKER MOTOR FREIGHT, INC., Plaintiff–Appellant,**

v.

**FIFTH THIRD BANK, Defendant– Appellee.**

No. 95–4041.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 4, 1996.

Decided June 20, 1997.

**1138**

Neill T. Riddell (argued and briefed), Eames Wilcox, Detroit, MI, for Plaintiff–Appellant.

R. Kenneth Wellington, II (argued), John C. Greiner (briefed), Graydon, Head & Ritchey, Cincinnati, OH, for Defendant–Appellee.

Before: KRUPANSKY, BOGGS, and SILER, Circuit Judges.

KRUPANSKY, Circuit Judge.

Plaintiff, Parker Motor Freight, Inc. ("Parker"), has appealed from a district court's order of summary judgment dismissing its complaint, which had sought to recover funds deposited by a third party, OK Trucking Co. ("OK"), into an account maintained by defendant, Fifth Third Bank ("Fifth Third"). Parker has alleged three errors: (1) the district court failed to apply the principles of the rail carrier "interline trust doctrine" to motor carriers even though the services offered by both types of carriers present no meaningful difference; (2) the district court mistakenly concluded that Fifth Third's interest in the funds at issue exceeded Parker's interest as a matter of law; and (3) the district court prematurely granted summary judgment because of existing conflicting evidence concerning Fifth Third's knowledge, or lack thereof, of the alleged fiduciary relationship between OK and Parker, and the resulting trust that was imposed upon the funds in controversy by their conduct as interliners.

On December 7, 1987, OK entered into a Loan and Security Agreement ("Loan Agreement") with Fifth Third. This agreement granted Fifth Third a lien on all "[a]ccounts" and "money," among other possessions, of OK in exchange for certain revolving credit loans. Under the Loan Agreement, default by OK entitled Fifth Third to a "set off against . . . all Collateral, balances, credits, deposits, accounts or monies" of OK held by Fifth Third. J.A. at 58.

Parker and OK are common motor carriers, and were, at all relevant times, certified by the Interstate Commerce Commission ("ICC")[1] to transport property on a for-hire, regulated basis throughout the forty-eight continental United States. Because Parker principally operated in the state of Michigan, it participated in an "interline freight network" system that permitted customers to make a single payment to ship freight from its place of origin to its destination, although the shipment traveled on two or more truck lines, or "through routes," over the course of its passage. This service is commonly referred to within the motor freight industry as "jointline" or "interline" service. The general practice and custom regarding this feature dictate that the single payment for freight revenue would be collected by one of the jointline carriers on behalf of itself and the other carriers participating in the interline movement. The participating motor freight carriers received their respective share of the collected revenues, prorated on the basis of services performed.

On May 14, 1990, Parker entered into such an interline agreement ("Interline Agreement") with OK. This agreement was in accordance with the contemporary authority set forth at 49 U.S.C. § 10703(a)(4)(A) (1986). Section 10705(h) required any motor freight jointliner which accepted payment to "promptly pay divisions or make interline

---

1. President Clinton abolished the ICC when he signed H.R. 2539, 104th Cong. (1995), into law on January 8, 1996. *See* 1995 U.S.C.C.A.N. 933–1.

settlements ... with other carriers which are parties to such through route and joint rate." 49 U.S.C. § 10705(h) (1983).[2] According to the Interline Agreement, "[s]uch payment w[ould] be made weekly," unless a dispute arose regarding the payment. In those circumstances, both carriers would promptly meet to arrive at "a mutually agreeable solution." J.A. at 25.

In its complaint filed on February 4, 1994, Parker alleged that between May 14, 1990, and August 18, 1991, OK failed to pay Parker revenues collected for its carriage of 576 interline shipments, totaling $96,304.35. Parker further alleged that OK had deposited these and other funds received from shipments into OK's bank account at Fifth Third, which took possession of the funds and applied the money to offset debts owed it by OK pursuant to the Loan Agreement.[3]

On July 26, 1994, Fifth Third moved for summary judgment. The matter was referred to a United States magistrate judge, who subsequently issued a Report and Recommendation ("R & R") recommending that the motion be granted and that Parker's complaint be dismissed. Parker requested a review of the magistrate's R & R by a United States district judge. On August 22, 1995, the district judge adopted the magistrate's R & R with two modifications and entered summary judgment for the defendant. Parker has timely appealed.

■ This court reviews appeals from grants of summary judgment *de novo*. *EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). It must assess "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

In performing this assignment, the court must "draw all justifiable inferences in favor of the non-moving party." *Winningham v. North Am. Resources Corp.*, 42 F.3d 981, 984 (6th Cir.1994). Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. At least one genuine issue of material fact must exist. *Middleton v. Reynolds Metals Co.*, 963 F.2d 881, 882 (6th Cir. 1992). A fact is material if it will "affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510.

Parker's first assignment of error alleged that the district judge erroneously concluded that interline freight revenue collected by one jointliner on behalf of another is not held in trust for the other participating carrier as a matter of law. Parker has relied on this circuit's precedent announced in *In re Ann Arbor Railroad Co.*, 623 F.2d 480 (6th Cir. 1980) (adopting a rule articulated in *In re Penn Central Transportation Co.*, 486 F.2d 519, 523–27 (3d Cir.1973) (en banc), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974)), to contend that "interline freight revenue paid to a carrier by shippers for interline transportation services rendered to shippers by another carrier is held in trust for that other carrier, and that the interline carrier's claim against those freight revenues is not merely an unsecured business debt." Appellant's Br. at 16.

In *Penn Central*, the Third Circuit, sitting *en banc*, applied common law trust principles to a jointline network of rail carriers to ordain that "transportation and freight charges, *when collected*, are held in trust for

---

**2.** Since the parties' execution of the Interline Agreement, Congress has significantly revised Title 49 of the United States Code. In particular, the ICC Termination Act of 1995 substantially revised the provisions that deal with rail and motor carriers. The new act continues to permit motor carriers to enter interline agreements, but no longer specifically requires the parties to make "prompt" payments, absent a provision in the agreement to that effect and approval by the Surface Transportation Board. *See* Pub.L. 104–

88, § 102, 109 Stat. 803, 869–870 (1995), *codified at* 49 U.S.C. § 13703 (1997). Nevertheless, under § 13701(a), through routes and divisions of joint rates for motor carriers must still be reasonable.

**3.** The record does not disclose the dates when OK defaulted, when Fifth Third seized the funds, or when Parker learned of the seizure.

the [participants]." *Penn Central*, 486 F.2d at 524. This court, in *Ann Arbor*, embraced the *Penn Central* reasoning to conclude that interline "freight charges must be treated as trust funds" for rail carriers. *Ann Arbor*, 623 F.2d at 482. It later explained in *Missouri Pacific Railroad Co. v. Escanaba & Lake Superior Railroad Co.*, 897 F.2d 210 (6th Cir.1990), that the common law principles announced by the Third Circuit in *Penn Central* were applicable to all jointline railroads, regardless of size. *Id.* at 214.

Whether the interline trust doctrine accepted by this court in *Ann Arbor* should extend to motor carriers, as Parker has urged, is a question of first impression. Because the interline trust doctrine's application to rail carriers is rooted in a federal common law first articulated in the Third Circuit, not a statute or regulation, *see* In re *Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1056 (3d Cir.1993) (explaining that *Penn Central* announced a rule of "[f]ederal common law"), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994), the instant review considers the Third Circuit's justification for adopting the common law trust principles as the anchor for its interline trust doctrine pronouncements.

Although Parker has conceded that *Ann Arbor* and its Sixth Circuit progeny were confined to "*rail* carriers subject to the Interstate Commerce Act," it has argued that "the character of the interline services considered in those decisions differs in no meaningful way from the conduct of interline services by motor carriers regulated by the Interstate Commerce Act." First, it posits that the practice and custom in the industry dictate that "freight revenues are usually collected by [one carrier]." Second, this method is "convenient for the shippers who would otherwise be faced with the prospect of making separate payment arrangements with the participating interline carriers." Third, like the nation's rail lines, motor carriers provide "an important network of regionally based carriers which play an essential role for the shipping public."

▪ In response, Fifth Third has asserted that a critical distinction between rail and motor carriers counsels limiting the interline trust doctrine within this circuit to the former mode of transportation. Unlike the trucking industry, it has argued, the nation's rail system functions as a single, unified system, frequently vesting exclusive control over transportation to a given area in a single railroad. Indeed, although the law requires rail carriers to establish jointline relationships, *see* 49 U.S.C. § 10703 ("Rail carriers ... *shall* establish through routes (including physical connections) with each other ....") (emphasis added), it does not mandate similar conduct by motor carriers, *see* 49 U.S.C. § 13703(1) ("A motor carrier ... *may* enter into an agreement with one or more such carriers to establish ... through routes ....") (emphasis added). Regardless, the lack of a legislative mandate that motor carriers jointline does not constrain this court from recognizing the trust status of funds held by one carrier for the account of another that has performed services during the carriage. Accordingly, this court elects to so impress a trust in such circumstances. *See Columbia Gas Sys. Inc.*, 997 F.2d at 1056 (interpreting the seminal *Penn Central* decision to have created "[f]ederal common law [to] impose[ ] a trust when an [y ] entity acts as a conduit, collecting money from one source and forwarding it to its intended recipient") (emphasis added). *But see In re Iowa Railroad Co.*, 840 F.2d 535 (7th Cir.), *cert. denied*, 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988).

▪ Having concluded that the common law trust principles embraced in the interline trust doctrine apply equally to a joint network of rail and motor carries, it follows that "transportation and freight charges, *when collected* [by one motor carrier on behalf of another for services that the latter has performed], are held in trust for the [latter carrier]." *Penn Central*, 486 F.2d at 524. This court must next resolve Parker's second assignment of error and determine whether the existing fiduciary relationship between OK and Parker entitled Parker to a priority interest in the funds on deposit with Fifth Third. *Cf. Federal Ins. Co. v. Fifth Third Bank*, 867 F.2d 330, 334 (6th Cir.1989) ("Having decided that an express trust was formed ... does not end our inquiry, for we need to

address ... whether [plaintiff] can recover these 'trust funds'...."). This inquiry requires the court to ascertain the relevant law of Ohio, for it is the forum state. *See Klaxon v. Stentor,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). The parties' agreement that Ohio substantive law should govern the instant matter, coupled with Fifth Third's location and OK's incorporation in the state, eliminates the general need to examine the state's choice of law principles. *Cf. Sekeres v. Arbaugh,* 31 Ohio St.3d 24, 508 N.E.2d 941, 942 (1987) (upholding a forum selection clause because it was supported by "some reasonable basis").

Accordingly, as this court explained in *Federal Insurance,*

> A bank has a common law right of setoff; it can apply deposits belonging to the depositor to the pre-existing indebtedness of the depositor. However, a bank does not have an automatic right of setoff when the funds are held by the depositor in a fiduciary capacity....
>
> The majority rule is that where a bank has no knowledge of the interest of a third party in an account, it may set off any obligations owed by the party in whose name the account is entered. However, Ohio follows the minority rule, also termed the "equitable rule," which states that:
>
> "A Bank, even though it has no knowledge, either express or implied, that another than the depositor has an interest in the funds deposited in his own name, can not apply such funds to the individual indebtedness to it of the depositor, where such lack of knowledge has not resulted in any change in the Bank's position and no superior equities have been raised in its favor."

867 F.2d at 334–35 (quoting *Kull v. North High Sav. & Loan Co.,* 21 Ohio Law Abs. 172, 176 (App.1935)) (citation omitted).

It would appear that Fifth Third's interest in the funds at issue could have exceeded Parker's only if it (1) had neither express nor implied knowledge of OK's fiduciary relationship with Parker, and (2) changed its position in reliance upon that ignorance. *See id.*

■ Fifth Third has attempted to distinguish this clear articulation of law by relying upon *Delta Pride Catfish, Inc. v. Marine Midland Business Loans, Inc.,* 767 F.Supp. 951 (E.D.Ark.1991). It has argued that *Kull* 's principle applies only to unsecured debts, and that Fifth Third's security interest in OK's funds pursuant to the Loan Agreement endowed Fifth Third with an interest superior to Parker, notwithstanding the application of the interline trust doctrine, or its express or implied knowledge of the existing fiduciary relationship between Parker and OK. The weakness in this argument is that the court in *Delta Pride* construed Arkansas law to subordinate an interest based on trust status to a lender's security interest. *Id.* at 963. In Ohio, the seat of the applicable law in the instant case, property held in trust for a beneficiary is not subject to the debts of the trustee because the latter has no equitable right to the enjoyment of that property. *See, e.g., Barrs v. Barrs Rent–A–Car Co.,* 71 Ohio App. 465, 50 N.E.2d 388, 389 (1943) ("[I]f the United States was the equitable owner of this bank account, it would not be subject to the debts of the legal owner. There would be no beneficial right to subject to his debts."); *cf. Manley v. Hunt,* 1 Ohio 257, 258 (1824) ("It would be productive of much mischief and injustice to make trust estates liable to judgments against the trustee. Such a principle never has been, and we trust never will be recognized in this state."). This result also comports with the common sense notion that Fifth Third's interest in OK's property—to secure the latter's payment or performance of its obligation under the Loan Agreement—does not entitle Fifth Third to usurp Parker's equitable right to enjoy the benefit of its hard-earned proceeds entrusted to OK. *Cf. United Bhd. of Carpenters & Joiners of Am., Local 2077 v. Paul Lugger Displays, Inc.,* 2 Ohio App.3d 190, 441 N.E.2d 581, 583 (1981) (subordinating a shareholder's security interest in a corporation to that of the beneficiaries of funds held in trust owing to an employee pension or insurance plan).

■ The recognition of the interline trust doctrine's operation on motor carriers and the historical respect in Ohio for funds held in trust obviates Parker's final assignment of error, which has charged that the district

court granted summary judgment prematurely. Because the Loan Agreement between Fifth Third and OK indicated that the latter was in the trucking industry, J.A. at 37, and Parker's unrebutted affidavit has explained that jointlining is a common practice in that trade, *id.* at 62–64 (Aff. of L. Roger Johnson), assessment of the facts in the light most favorable to Parker counsels the conclusion that Fifth Third had, at minimum, "inquiry notice" that funds deposited by OK included interline proceeds. *See Federal Ins. Co.,* 867 F.2d at 335–36 (noting that a working relationship between a bank and its depositor was sufficient to charge the bank with inquiry notice to determine the true character of the funds before accepting them). Since Fifth Third's knowledge of the law must be presumed, it cannot avail itself of the mistake-of-law defense, *Ohio v. Pinkney,* 36 Ohio St.3d 190, 522 N.E.2d 555, 561–62 (1988), and cannot convincingly argue that the Loan Agreement guaranteed that OK's deposits would be free from liens, offsets, or similar obligations. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 732 n. 9, 104 S.Ct. 2709, 2719 n. 9, 81 L.Ed.2d 601 (1984) (noting the clear federal power to retroactively alter private contractual rights).

Despite this legal conclusion, the court is reluctant to simply reverse the judgment below. Although the facts when viewed in the light most favorable to Parker suggest that Fifth Third had at least inquiry notice about the nature of funds in OK's account, thereby seemingly depriving Fifth Third of escaping its obligation under *Kull,* this court declines to grant what would effectively be summary judgment for the nonmoving party in this case.

Accordingly, the summary judgment is REVERSED and the case REMANDED to the district court to determine if Fifth Third had the requisite ignorance and change of position to maintain a superior interest to Parker as articulated in *Kull.*