**In re FLYING BOAT, INC., d/b/a Pan Am Air Bridge, Debtor.**

**Bankruptcy No. 399–30339–RCM–11.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Nov. 30, 1999.

Andrea Horowitz Handel, J. Christopher Kohn, Tracy J. Whitacker, Department of Justice, Washington DC, for United States.

John D. Penn, Mark X. Mullin, Eric Terry, Dallas, TX, for Trustee.

David W. Ogden, Paul E. Coggins, Myrna B. Silen, Dallas, TX, for Debtor.

### *MEMORANDUM OPINION ON OBJECTION TO CLAIMS OF THE UNITED STATES*

ROBERT C. McGUIRE, Chief Judge.

On October 26, 1999, came on to be heard the objection of Michael A. McConnell, Trustee and post-confirmation Estate Representative of Debtor (hereafter referred to as "Trustee"), to the claims of the United States Department of Agriculture ("USDA"), and Immigration and Naturalization Service ("INS"). The Court has jurisdiction of this core proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A) & (B). The foregoing and following are the Court's findings of fact and conclusions of law under Bankruptcy Rules 9014 and 7052.

### *Ruling*

The INS user fees are not express or constructive trust funds of the INS held by Flying Boat, Inc. ("Debtor").

The USDA user funds were held by Debtor under express trust and the USDA traced its express trust user fees into Debtor's accounts. The facts are substantially undisputed. Trustee's Exhibit ("TX") 1 is an undisputed analysis of Debtor's bank account balances from December 1, 1998 through February 8, 1999.

### *Facts of the Case*

On January 11, 1999, an involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Debtor. Thereafter, the United States and its agencies filed proofs of claims against the Debtor. The claims of both agencies arise out of the user fees collected by the Debtor in connection with ticket sales. INS filed an estimated claim of $23,938.40 for international passenger inspection user fees pursuant to 8 U.S.C. § 1356. USDA filed an estimated claim of $14,265 for user fees pursuant to 21 U.S.C. § 136a. Both user fee claims were filed under the theory that the fees were collected and held in trust by the Debtor for the benefit of the INS and USDA, and, as such, were not property of the estate under 11 U.S.C. § 541. On or about September 17, 1999, the Trustee objected to the INS and USDA's user fee trust claims.

Congress enacted these two statutes to finance passenger inspections and to prevent the spread of animal and plant disease respectively.

On February 8, 1999, a trustee was appointed as an interim trustee in the case, and, on March 12, 1999, an order for relief under Chapter 11 was entered and the trustee was retained as Chapter 11 Trustee. Subsequently, a plan was confirmed.

There is no dispute in this case as to the amounts that the INS and USDA are owed, but there is a dispute as to whether such user fees were held in trust by Debtor.

The Trustee's objection only relates to such user fee prepetition claims. If the

United States is unsuccessful on its trust fund claims, then the United States has an unsecured claim against the Debtor in the amount of the user fees. A portion of the total amount of user fees owed ($4,783.20) is payable as a gap priority claim under § 507(a)(2).

### Applicable Law

*See generally* Christian Onsager, *Trust Fund Taxes in Bankruptcy: Begier v. IRS Five Years Later,* 15 AM. BANKR. INST. J. 15 (Feb.1996).

In *In re Haber Oil Co.,* 12 F.3d 426, 435 (5th Cir.1994), the court stated:

In effecting its underlying policies, the Bankruptcy Code defines the bankruptcy estate very broadly, encompassing most of the property held by the bankrupt. 11 U.S.C. § 541. Herein, however, lies the potentially uneasy interaction between federal and state law: in the absence of controlling federal bankruptcy law, the substantive nature of the property rights held by a bankrupt and its creditors is defined by state law. *Chiasson v. J. Louis Matherne and Assocs. (In re Oxford Management, Inc.),* 4 F.3d 1329, 1334 (5th Cir.1993); *see also Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

■ If state law were applied, then the forum state law applies absent other considerations. *Matter of Iowa R. Co.,* 840 F.2d 535, 542 (7th Cir.1988). If the forum law of Texas were applicable, then *Matter of Haber* points out that, for a constructive trust under tax law, there is needed a breach of fiduciary relationship or actual fraud. *Haber,* 12 F.3d at 437. No constructive trust was pled nor was any breach of fiduciary relationship or fraud proven. Absent a federal trust, it appears no other breach of any fiduciary agency relationship was shown. *In re Coupon Clearing Service, Inc.,* 113 F.3d 1091, 1099 *et seq.* (9th Cir.1997).

■ Section 541 provides that a bankrupt debtor's estate comprise of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). A debtor does not "own an equitable interest in property .... [they] hold in trust for another," and therefore funds held intrust are not "property of the estate." *See Begier v. I.R.S.,* 496 U.S. 53,59, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). The legislative language of § 541 makes clear that funds held by a debtor for a third party are not part of the debtor's bankruptcy estate.

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but *will be held in trust for another.* For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of bills to the debtor before the debtor has paid the bill for which the payment was reimbursement, the payment *would actually be held in constructive trust* for the person to whom the bill was owed.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1977)(emphasis added), reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 6324.

It is not so clear that this example chosen by Congress is indeed an example of when a constructive trust would be appropriate. *See Skilled Nursing Professional Services v. Sacred Heart Hospital (In re Sacred Heart Hosp.),* 175 B.R. 543, 550 n. 1 (Bankr.E.D.Pa.1994).

Both sides discuss *Begier v. I.R.S.,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46, extensively. In *City of Farrell v. Sharon Steel Corp.,* 41 F.3d 92, 95 n. 4 (3rd Cir.

1994), the court discusses the normal reliance on state law to determine property rights, and points out:

> *Begier* is not inconsistent with Goldberg's approach. In *Begier,* the Court solely confronted federal issues, so it naturally looked to federal law to determine whether the claimant proved a trust relationship. Additionally, the Court looked to federal law to determine whether the claimant identified and traced the trust funds.

In *Official Committee of Unsecured Creditors of the Columbia Gas Transmission Corp. v. Columbia Gas Systems Inc. (In re Columbia Gas Systems Inc.),* 997 F.2d 1039 (3rd Cir.1993), Columbia, an owner of a natural gas pipeline company, petitioned the court for permission to pay certain pre-petition obligations, including, refunds collected and owed to Columbia customers and research surcharges collected from customers and owed to a nonprofit research institute. The refunds resulted from overcharges while the surcharges were proscribed pursuant to the FERC's regulatory mechanism. The bankruptcy court found that the property sought to be distributed was property of the estate and not entitled to distribution. Columbia appealed asserting that the bankruptcy court had erred in failing to find that the property it held were trust funds and not part of the bankruptcy estate.

On appeal, the court went into great discussion in deciding whether state or federal law should be used to resolve the issue. Because the case involved the interpretation of a federal statute and because the nature of the issue, the court concluded that the application of federal common law was appropriate.

■ In the present case, because federal user fees statutes are involved, it appears that federal law applies. In *In re Columbia Gas Systems, Inc.,* the court stated:

> It is axiomatic that federal law governs questions involving the interpretation of a federal statute. *See Kamen v.*

*Kemper Fin. Services,* [500] U.S. [90, 97–99], 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991). Therefore, it is clear, and the parties do not dispute, that federal law defines the parameters of section 541(d) of the Bankruptcy Code. This, however, is only the beginning of the inquiry. The determination that federal law applies does not inevitably require the application of a uniform federal rule. Applying federal law, courts may either fashion a uniform federal common law rule or adopt state law as the federal rule of decision. *See id.; United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711 (1979).

In *Kimbell Foods,* the Supreme Court outlined the analysis that determines whether uniform federal common law or state law should apply. The determination depends on the nature and importance of the government interest at issue and the effect of applying state law. *Kimbell Foods,* 440 U.S. at 727–28, 99 S.Ct. at 1458. To decide whether a national federal rule is necessary, courts should consider: (1) the need for a nationally uniform law; (2) whether incorporation of state law would frustrate specific objectives of the federal program at issue; and (3) the extent to which application of a federal common law rule would upset commercial expectations that state law would govern. *See id.* at 728–29, 99 S.Ct. at 1458–59; *Adams v. Madison Realty & Dev. Inc.,* 937 F.2d 845, 856 (3d Cir.1991). Developing a federal common law rule is the exception rather than the rule. Federal law should coincide with the relevant state law unless state law would undermine the objectives of the federal statutory scheme and there is a distinct need for nationwide legal standards. *See Kimbell Foods,* 440 U.S. at 728, 99 S.Ct. at 1458.

Whether the customer refunds are held in trust for Columbia's customers, and therefore excluded from the bank-

ruptcy estate, sufficiently implicates important federal interests to warrant the application of federal common law. First, a national uniform law is necessary. The refunds at issue are created by an order of FERC. Their purpose is to compensate customers who have been charged excessive rates for natural gas. Private parties may not alter the refund orders by contract or otherwise. Indeed, the very purpose of the NGA is to supersede private contractual arrangements that interfere with the federal objective of ensuring that pipelines charge only reasonable rates. Because the refunds arise directly from federal law and implement the central objective of the NGA, the property rights Columbia has in these customer refunds should not be subject to the vagaries of state trust law. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310, 108 S.Ct. 1145, 1156, 99 L.Ed.2d 316 (1988) ("[U]niformity of regulation ... was an objective of the Natural Gas Act.") (quoting *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas*, 372 U.S. 84, 91–92, 83 S.Ct. 646, 651, 9 L.Ed.2d 601 (1963)).

Second, applying state law to determine Columbia's property rights in the refunds would frustrate the NGA's central purpose, to provide natural gas to the public at reasonable rates. *See generally FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 612, 64 S.Ct. 281, 292, 88 L.Ed. 333 (1944) (NGA is "plainly designed to protect the consumer interests against exploitation at the hands of private natural gas companies"). Trust law in numerous states imposes a constructive trust on funds only if wrongdoing has resulted in unjust enrichment. . . . [citations omitted] Absent an express trust or affirmative wrongdoing, state law would not hold the refunds in trust on behalf of Columbia's customers. Federal common law, however, provides a more expansive definition of an implied trust. Federal common law imposes a trust when an entity acts as a

conduit, collecting money from one source and forwarding it to its intended recipient. *See In re Penn Central Transp. Co.*, 486 F.2d 519, 523–27 (3d Cir.1973) (in banc), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).

\*  \*  \*  \*  \*  \*

Application of state law not only would frustrate the purpose of the NGA, but also would warp the definition Congress intended to provide to the exclusion from the bankruptcy estate for equitable interests. *See* 11 U.S.C. § 541(d). The legislative history of section 541(d) makes clear that when a debtor collects money on behalf of another, this money is held in constructive trust for the intended eventual recipient even absent any misconduct. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 368 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6324. Since in some cases state law is inconsistent with this definition, it must be displaced.

Finally, applying federal common law will not upset commercial expectations that state law would govern. Creditors cannot reasonably assume that state law will allocate various parties' interests in federally created property rights. Moreover, this court already has developed federal common law concerning trusts. *See Penn Central*, 486 F.2d at 523–25. Therefore, our decision to apply federal common law will not require us to announce new doctrines of substantive law unforeseen by the parties.

\*  \*  \*  \*  \*  \*

All parties agree that a trustee has no equitable interest in funds it holds in trust. Indeed, that is the classic definition of a trust—the beneficiary has an equitable interest in the trust property while legal title is vested in the trustee. *See* Restatement (Second) of Trusts § 2 cmt. f (1959); 1 A.W. Scott & W.F. Fratcher, *The Law of Trusts* § 12.2 (4th ed.1989). *Therefore, if Columbia holds*

*the customer refunds in trust, as it asserts*, these refunds are excluded from Columbia's bankruptcy estate and are immediately payable to its customers. [Emphasis added]

Congress clearly intended the exclusion created by section 541(d) to include not only funds held in express trust, but also funds held in constructive trust.[7]

7. We do not reach the question whether section 541(d) excludes any interest other than funds held in trust.

\* \* \* \* \* \*

Applying federal common law, this court previously has imposed an implied trust on funds held by a bankrupt debtor for another entity. *See In re Penn Central Transp. Co.*, 486 F.2d 519, 523–27 (3d Cir.1973) (in banc), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974).[8]

8. *Penn Central* is a pre-Bankruptcy Code decision, but its analysis of whether the interline balances were held in trust is identical to the inquiry the Code requires.

*In re Columbia Gas Systems, Inc.*, 997 F.2d at 1055–56, 1059. (Emphasis added) (Citations omitted)

With both the refunds and the surcharges, Columbia was ordered to collect property. In return, Columbia was under an obligation to remit the property to a third party. In both cases, Columbia did not receive the property on account of the goods or services it had rendered. Columbia did not pay any interest on the money it received. Instead, Columbia was acting as a "receiving and transmitting agent, or a conduit" for property owed to third parties. *See id.* at 1060–61. As such, the court held that, under federal common law, the property held by Columbia was for the benefit of another and not property of the bankruptcy estate. *See id.* at 1062.

In *Matter of Iowa R. Co.*, 840 F.2d at 542, Judge Easterbrook appears to question the logic of the seminal *Penn Central*

trust analysis' reliance on unspecified state common law.

In the case of *Parker Motor Freight, Inc. v. Fifth Third Bank*, 116 F.3d 1137, 1139–40 (6th Cir.1997), the court stated:

In *Penn Central* the Third Circuit, sitting *en banc*, applied common law trust principles to a jointline network of rail carriers to ordain that "transportation and freight charges, *when collected*, are held in trust for the [participants]." *Penn Central*, 486 F.2d at 524. This court, in *Ann Arbor*, embraced the *Penn Central* reasoning to conclude that interline "freight charges must be treated as trust funds" for rail carriers. *Ann Arbor*, 623 F.2d at 482. It later explained in *Missouri Pacific Railroad Co. v. Escanaba & Lake Superior Railroad Co.*, 897 F.2d 210 (6th Cir. 1990), that the common law principles announced by the Third Circuit in *Penn Central* were applicable to all jointline railroads, regardless of size. *Id.* at 214.

Whether the interline trust doctrine accepted by this court in *Ann Arbor* should extend to motor carriers, as Parker has urged, is a question of first impression. Because the interline trust doctrine's application to rail carriers is rooted in a federal common law first articulated in the Third Circuit, not a statute or regulation, *see In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, 1056 (3d Cir.1993) (explaining that *Penn Central* announced a rule of "[f]ederal common law"), *cert. denied*, 510 U.S. 1110, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994), the instant review considers the Third Circuit's justification for adopting the common law trust principles as the anchor for its interline trust doctrine pronouncements.

\* \* \* \* \* \*

Regardless, the lack of a legislative mandate that motor carriers jointline does not constrain this court from recog-

nizing the trust status of funds held by one carrier for the account of another that has performed services during the carriage. Accordingly, this court elects to so impress a trust in such circumstances. *See Columbia Gas Sys. Inc.*, 997 F.2d at 1056 (interpreting the seminal *Penn Central* decision to have created "[f]ederal common law [to] impose[ ] a trust when *an[y] entity* acts as a conduit, collecting money from one source and forwarding it to its intended recipient") (emphasis added). *But see In re Iowa Railroad Co.*, 840 F.2d 535 (7th Cir.), *cert. denied*, 488 U.S. 899, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988).

In *Begier*, the Supreme Court did not mention the *Penn Central* court's trust analysis as part of common law, but instead chose to analyze the precise wording of the tax statute to see how it aligned with traditional trust concepts.

The INS statute involved is 8 U.S.C. § 1356. Section 1356(f) states:

(1) Each person that issues a document or ticket to an individual for transportation by a commercial vessel or commercial aircraft into the United States shall—

(A) collect from that individual the fee charged under subsection (d) of this section at the time the document or ticket is issued; and

(B) identify on that document or ticket the fee charged under subsection (d) of this section as a Federal inspection fee.

\*     \*     \*     \*     \*     \*

(3) The person who collects fees under paragraph (1) or (2) shall remit those fees to the Attorney General at any time before the date that is thirty-

one days after the calendar quarter in which the fees are collected, except the fourth quarter payment for fees collected from airline passengers shall be made on the date that is ten days before the end of the fiscal year, and the first quarter payment shall include any collections made in the preceding quarter that were not remitted with the previous payment.

The Trustee argues that the above language does not create a trust in favor of the INS. According to the Trustee's argument, if Congress intended to create a trust, it would have said so as it did in § 7501.

█ It appears that the INS user fees are not part of an express trust. Trust language was not used and Congress knows how to use express trust language to protect collected government user fees [1] or taxes.[2]

It is recognized that the Third Circuit, in the *Columbia Gas Systems* case, and the Sixth Circuit, in the *Parker* case, have found a federal common law to justify imposition of a trust in a conduit situation in the selected isolated areas such courts were considering. In both situations, the courts were concerned with the protection of public rights, consumer rights, or specific industries. Both circuits rely on the *Penn Central* case previously discussed, for their underpinning. The present case, where protection of government user fees is concerned, is more similar to the *Begier* situation. However, unlike *Begier*, or the USDA statute, the INS statute does not create an express trust and no federal common law, express or constructive trust was proven that was applicable to INS user fees.

---

1. *See* U.S.D.A. statute quoted herein.

2. 26 U.S.C. § 7501 states:
(a) General rule.—Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States. The amount of such fund shall be assessed, collected, and paid in the same manner and subject to the same provisions and limitations (including penalties) as are applicable with respect to the taxes from which such fund arose.

In the case of *The Oxford Organisation, Ltd. v. Peterson (In re Stotler and Co.)*, 144 B.R. 385, 388 (N.D.Ill.1992), after discussing the trust created under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499e(c) and other specific statutes, and finding that, absent specific stationary mandate, constructive trusts of funds used by bankruptcy trustees are not favored, the court stated:

This may be because a constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code. As the court in *In re Behring International, Inc.*, 61 B.R. 896 (Bankr. N.D.Tex.1986), explained:

The reluctance of Bankruptcy Courts to impose constructive trusts without a substantial reason to do so stems from the recognition that each unsecured creditor desires to have his particular claim elevated above the others. Imposition of a constructive trust clearly thwarts the policy of ratable distribution and should not be impressed cavalierly.

*Id.* at 902. The Seventh Circuit shares this reluctance. *See Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir.1990) (" 'Furthermore, the grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion.' ") (quoting *Suttles v. Vogel*, 126 Ill.2d at 194, 127 Ill.Dec. at 823, 533 N.E.2d at 905).

Cited with approval by Sixth Circuit in *In re Omegas Group, Inc.*, 16 F.3d 1443, 1450 (6th Cir.1994). For other types of statutorily-imposed trusts, see 5 COLLIER ON BANKRUPTCY ¶ 541.11[4] (15th ed. rev.1999).

### *USDA Trust Funds*

21 U.S.C. § 136 states that the Secretary of Agriculture, in carrying out its regulations and prohibitions, may enter into agreements with operators or owners of aircraft for the purpose of providing inspection services at points of entry into the United States. Section 136 expressly states that "any such agreement shall provide for the payment by the operator or owner of an amount determined by the Secretary to be necessary to defray the costs of providing additional service pursuant to such agreement." Section 136a provides that the

Fees collected under this subsection by any person on behalf off the Secretary are held in trust for the United States and shall be remitted to the Secretary in such manner and at such times as the Secretary may proscribe.

■ Unlike the INS situation, with respect to the USDA, both parties agree that § 136(a) establishes a trust in favor of the USDA; therefore, the existence of the trust is not an issue. However, the parties disagree as to the necessity of, or results of, tracing.

### *Obligation to Trace*

■ Once it is established that a trust relationship exists, a claimant must then "identify and trace the trust funds if they were commingled." *City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95 (3rd Cir.1994). In the present case, the Debtor failed to maintain separate accounts for the collected fees, thus, the accounts are commingled. The Trustee takes the position that in determining the amount of funds held in trust, the court should apply a lowest intermediate balance test. Furthermore, in arriving at that balance, the Trustee argues that the payroll and Bahamian accounts should not be considered. The United States disagrees, citing a "reasonable assumption" standard as established by *Begier*. Furthermore, the INS and USDA assert that the balances of the payroll and Bahamian accounts should be considered under all circumstances.

### A. *The Appropriate Method for Tracing Trust Funds*

■ The determination of whether the claimant has traced and identified trust funds is a matter of federal law. *In re Kennedy & Cohen, Inc.*, 612 F.2d 963,

966 (5th Cir.1980). *See Mortgage Access Corp. v. Tyler (In re Dameron)*, 155 F.3d 718 (4th Cir.1998); *City of Farrell*, 41 F.3d 92, 95 (3rd Cir.1994). "To protect the interests of secured and unsecured creditors, beneficiaries of trust funds bear the burden of identifying and tracing their trust property." *See Columbia Gas Sys. Inc.*, 997 F.2d at 1063.

In *Begier v. I.R.S.*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990), AIA was required by law to withhold from employees' wages certain federal taxes. After getting behind on their remittance of these taxes, the IRS required AIA to maintain a separate account for the tax funds. However, AIA failed to comply, and, instead, paid the IRS with funds from a segregated account and their operating account. After AIA filed for bankruptcy, the trustee sought to avoid the IRS payments as preferential.

In its decision, the Bankruptcy Court found in part for the government and the trustee. The court refused to allow the trustee to recover the money paid out of the segregated account, but did allow recovery of the funds paid from the operating account. According to the court, the debtor had failed to properly segregate the trust funds and the government had failed to properly trace. The Third Circuit reversed, holding that all of the pre-petition payments were made with trust fund property and were not subject to being avoided by the trustee.

On appeal, the Supreme Court began by finding that § 7501 did establish a trust in favor of the government. However, the court was then presented the more difficult issue of how to determine which funds were trust funds. The trustee maintained the position that only the property held in the debtor's segregated account was trust property.

From the outset, the Court found important the unique nature of the statutory trust established by § 7501. Unlike a typical trust situation which may be governed by common law principals, the § 7501 trust is "radically different." *Id.* at 53, 110 S.Ct. at 2262.

> Unlike a common-law trust, in which the settlor sets aside particular property as the trust res, § 7501 creates a trust in an abstract 'amount'—a dollar figure not tied to any particular assets—rather than in the actual dollars withheld. Commonlaw tracing rules, designed for a system in which particular property is identified as the trust res, are thus unhelpful in this special context.

*Id.*

Furthermore, the Court examined in length the legislative history behind § 541 and its effect on trust fund taxes. It was obvious from legislative debates that Congress was clearly concerned about the government's inability to trace, and potentially lose, its trust property.

> A serious problem exists where 'trust fund taxes' withheld from others are held to be property of the estate where the withheld amounts are commingled with the other assets of the debtor. The courts should permit the use of reasonable assumptions under which the Internal Revenue Service, and the other tax authorities, can demonstrate that amounts withheld taxes are still in the possession of the debtor at the commencement of the case.

*Id.* at 65, 110 S.Ct. at 2266, cited from 124 Cong. Rec. 32392, 32417 (1978) (remarks of Rep. Edwards).

In finding no other guidance in the Bankruptcy Code as to which tracing rules to apply, the court adopted the "reasonable assumption" standard as suggested by Rep. Edwards to determine what property was trust property. *See Begier* at 67, 110 S.Ct. at 2267. However, the Court noted that "some connection between the § 7501 trust and the assets sought to be applied to a debtor's trust-fund obligation" must be shown. *Id.* at 65–66, 110 S.Ct. at 2266. In finding this connection, the Court again looked to legislative history for guidance.

A payment of withholding taxes constitutes a payment of money held in trust under Internal Revenue Code § 7501(a), and thus will not be a preference because the beneficiary of the trust, the taxing authority, is in a separate class with respect to those taxes, if they have been property held for payment, as they will have been if the debtor is able to make the payments.

*Id.* at 66, 110 S.Ct. at 2267, cited from H.R.Rep. No. 595, 95th Cong., 1st Sess. 368 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1977)(emphasis added), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6324.

Adopting a literal reading of the above passage, the Court found that the trustee was not able to avoid any of the government payments regardless as to the source of the funds.

As the House Report expressly states, the limitation that the funds must 'have been properly held for payment' is satisfied 'if the debtor is able to make the payment.' The debtor's act of voluntarily paying its trust-fund tax obligation therefore is alone sufficient to establish the required nexus between the 'amount' held in trust and the funds paid.

*Id.* at 66–67, 110 S.Ct. at 2267.

The Court did not expressly state what effect *Begier* would have on other trust fund cases, stating only,

The courts are directed to apply 'reasonable assumptions' to govern the tracing of funds, and the House Report identifies one such assumption to be that any voluntary prepetition payment of trust-fund taxes out of the debtor's assets is not a transfer of the debtor's property. Nothing in the Bankruptcy Code or is legislative history casts doubts on the reasonableness of that assumption. *Other rules might be reasonable, too,* but the only evidence we have suggests that Congress preferred this one.

*Id.* at 67, 110 S.Ct. at 2267 (emphasis added).

In *City of Farrell,* 41 F.3d 92, a case brought after *Begier,* the Third Circuit was faced with whether to apply the "reasonable assumption" standard of *Begier* to constructive trust funds. In *Farrell,* the debtor was required by local and state law to withhold income tax from its employees' wages. However, unlike *Begier,* neither statute contained express trust language.

In finding that the statutes did create a trust in favor of the government, the court focused on the similarities between *City of Farrell* and *Begier.* In both instances, a statutory scheme required the employer to withhold the appropriate portion of income when it paid its wages. In both cases, to require segregation in order to find the existence of a trust would "mean that an employer could avoid the creation of a trust simply by refusing to segregate." *Id.* at 98. In addition, in both cases taxes were imposed on the purchaser and not the seller. *Id.*

After deciding that the *City of Farrell* trust was similar to the *Begier* trust, the court elected to apply the 'reasonable assumption' method for determining trust property. "As we have concluded that we should analyze the trust in this case as *Begier* analyzed a section 7501 trust, we find that the common-law tracing rules *should not apply to our decision* . . ." *Id.* at 99.

However, unlike *Begier,* the court was unable to determine from the record whether the City of Farrell had met the required nexus requirement.

Thus, as *Begier* involved a pre-petition payment, while here we have no such payment, we cannot draw a conclusion from *Begier* as to whether the City of Farrell has met the nexus requirement.

*Id.* at 101. The court, however, did reject the argument that a nexus could only be shown if the employer had maintained a segregated account or paid trust funds pre-petition.

[This] argument misconstrues *Begier's* nexus requirement, because it contem-

plates that the nexus requirement is met only if the employer had segregated the trust fund taxes or transferred them to the taxing authority before the petition. Yet *Begier*'s reliance on Representative Edwards' remarks shows that the taxing authorities should be able to show the nexus requirement is satisfied in other ways.

*Id.*

Courts have been reluctant to extend *Begier* past the narrow scope of its holding. *See In re Plummer,* 174 B.R. 284 (Bankr.C.D.Cal.1992); *United States v. Borock (In re Ruggeri Electrical Contracting, Inc.),* 199 B.R. 903 (Bankr.E.D.Mich. 1996), *aff'd* 214 B.R. 481 (E.D.Mich.1997).

In *In re Plummer,* 174 B.R. 284, the debtor made three pre-petition payments to the IRS which the IRS applied to debt other than the debtor's delinquent tax withholdings. Relying on *Begier,* the Plummers argued that the IRS should have applied the payments to the delinquent taxes.

The court rejected that argument. Crucial to its determination that *Begier* was inapplicable was the fact that the debtor had failed to designate the payments as trust fund payments.

> Since designation by the debtor is crucial, the failure of [the debtor] to designate its payments to the IRS renders the *Begier* decision inapplicable. Had [the debtor] designated its payments appropriately, *Begier* would serve as a protective shield against preference law. Instead, Plummer asks this court to use *Begier* as a sword to force the IRS to apply undesignated funds towards trust fund obligations. Such a conclusion would not only expand the holding in *Begier,* but would also overrule well established judicial precedent supporting IRS payments.

*Id.* at 287.

In *Wasden v. Florida Dept. of Revenue (In re Wellington Foods, Inc.),* 165 B.R. 719 (Bankr.S.D.Ga.1994), the court found that a voluntary, pre-petition payment was necessary prior to applying the "reasonable assumption" standard of *Begier.*

> Without the predicate act of voluntary remittance, there is no conclusive presumption of a nexus between the creation of a trust (unless of course the debtor properly segregated the trust-fund taxes from the rest of his assets). *As a result, where there has been no voluntary payment, a taxing authority is still required to establish some sort of nexus through the use of traditional trust-fund tracing rules, such as the 'lowest intermediate balance' rule.*

*Id.* at 728. (Emphasis added).

In addition, since *Begier,* in cases involving trusts other than income tax withholdings, courts have continued to apply the lowest intermediate balance test rather the reasonable assumption standard. *See In re Dameron,* 155 F.3d 718 (4th Cir.1998). The lowest intermediate balance test is

> grounded in the fiction that, when faced with the need to withdraw funds from a commingled account, the trustee withdraws non-trust funds first, thus maintaining as much of the trust's funds as possible. Hence pursuant to the lowest intermediate balance rule, if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the trust funds will be returned in their full amount. Conversely, if the commingled fund has been depleted entirely, the trust is considered lost. Finally, if the commingled fund has been reduced below the level of the trust fund but not depleted, the claimant is entitled to the lowest intermediate balance in the account. In no case is the trust permitted to be replenished by deposits made subsequent to the lowest intermediate balance.

*Id.* at 724 (internal citations and quotations omitted).

In *In re Dameron,* Dameron was a real estate attorney who received funds from

various lenders to be held and distributed to third parties following closings. After it came to the attention of the State Bar of Virginia that Dameron was misappropriating the funds, various lenders filed an involuntary Chapter 11 petition against Dameron claiming to be creditors and commenced an adversary proceeding to recover their share of the funds.

Finding that the language of the parties' agreements and the circumstances supported an express trust under Virginia law, the court was then faced with the issue of whether the funds had been properly traced. At the time of filing bankruptcy, Dameron had only one account with a balance of $453,338. The creditors trust claim was $458,651. The account was commingled, in that it contained more than just the trust funds of the creditors. The court applied a lowest intermediate balance approach, finding that "because the account had been reduced below that amount, but not depleted entirely, the lenders are entitled to the lowest intermediate balance, without the benefit of any deposits made after such balance was reached." *Id.* at 724.

In *In re Columbia Gas Sys. Inc.*, 997 F.2d 1039, involving collected customer refunds and surcharges, the Third Circuit also embraced the lowest intermediate balance test. In doing so, the court acknowledged that the test may not always result in a favorable recovery of trust assets.

> It requires only a narrow extension of this holding to conclude that a trust beneficiary also loses property rights in commingled accounts to the extent that the account drops below the amount held in trust. This is the essence of the lowest intermediate balance test.

*Id.* at 1064.

In *Johnson v. Barnhill (In re Antweil)*, 154 B.R. 982 (Bankr.D.N.M.1993), the debtor reached a pre-petition agreement with a third party, Barnhill, to settle a dispute. The debtor made the settlement payment to Barnhill and then filed bankruptcy. The trustee sought to recover the settlement as a preference. In response, Barnhill argued that the payment was made from trust funds and not part of the estate.

In arguing that the lowest intermediate balance test was inapplicable, Barnhill relied on *Begier.* In rejecting Barnhill's argument and finding the lowest intermediate balance test appropriate, the court stated

> The *Begier* case is clearly distinguishable from the case at bar. *Begier* deals with a unique type of situation, a trust created for the benefit of the Internal Revenue Service. . . . Second, the Court in *Begier,* unlike the case at bar, was dealing with issues pertaining to an express, statutorily created trust. . . . Third, in *Begier,* the payments that the trustee was seeking to recover had been timely and voluntarily made by the debtor. . . . Under this circumstance, no persuasive argument can be made that the untimely payment, made only after suit was filed, can provide a sufficient nexus between any trust fund and the payment made to Barnhill.

*Id.* at 987.

▉ It appears that the lowest intermediate balance test is applicable in this case. Even assuming that *Begier* does establish a reasonable assumption standard for tracing trust funds beyond § 7501, *Begier* is distinguishable because it involved pre-petition payments. Also, *Begier* expressly states that its ruling is not a mandate, but other methods of tracing may be reasonable.

### How to Arrive at the Lowest Intermediate Balance

The parties disagree as to how to arrive at the lowest intermediate balance. The Debtor had seven accounts (*see* Trustee Exhibit 1)—a money market account, a Master/Visa Card account, an American Express account, an operating account, a payroll account, and two Royal Bank of Canada accounts (one, a United States ac-

**254**

count, which was inactive until January 1999, and one, a Bahamian account).

The money from the credit card accounts, which included user fees, flowed to the operating account. The payroll account came from the operating account. The Bahamian account included cash sales in the Bahamas, which included user fees. Where a user fee was charged as part of a credit card, in the Bahamas, such charge receipts went into the credit card accounts. As shown by Trustee Exhibit 1, the money market account had negligible deposits during the relevant period.

The Trustee contends that the lowest intermediate balance of each account should be used and also that the Bahamian account should be excluded.

Some cases appear to support the Trustee's view that the lowest intermediate balance of each account should be used.

In *Salisbury Inv. Co. v. Irving Trust, (In re United Cigar Stores Co.)*, 70 F.2d 313 (2nd Cir.1934), the claimant sought to assert a trust interest in several of the debtor's accounts. The court stated:

If a trustee mingles the trust funds with the mass of other funds, as long as there remains on hand a sufficient sum to cover the amount of the trust fund, *cestui que* trust may follow the trust fund and reclaim it. There can be no recovery, however, where all that can be shown is enrichment of the trustee. It must be clearly traced and identified in specific property. It is insufficient to show that trust property went into the general estate and increased the amount and the value thereof. In the instant case the appellants have failed to show more than a general enrichment to the bankrupt's estate. The bankrupt's accounts appear to have been active. There might have been a reduction of each of these accounts in turn to practically nothing, and yet, the aggregate be above the alleged trust fund amount at all times. To recover, the funds must be traced into the estate and now be

found. There is no evidence that the trust fund has remained intact during the possession of the trustee's possession.

*Id.,* at 316. *See also Connecticut General Life Ins.Co. v. Universal Ins. Co.*, 838 F.2d 612 (1st Cir.1988) (citing *United Cigar* with approval); *In re Wellington Foods, Inc.*, 165 B.R. at 726 n. 7.

With respect to the Bahamian account, it is undisputed that such account included cash receipts for the user fees in question.

In *Begier*, as previously discussed, the trustee maintained an argument similar to the Debtor's trustee. In *Begier*, the Trustee asserted that the operating account, because it was not segregated, should not be found to include trust property. The Court disagreed.

The Internal Revenue Code directs 'every person receiving payment for facilities or service' subject to excise taxes to 'collect the amount of the tax from the person making such payment.' It also require that an employer 'collect FICA taxes from the wages when paid.' Both provisions make clear that the act of 'collecting' occurs at the time of payment for the services in the case of excise taxes and the employer's payment of wages in the case of FICA taxes. The mere fact that AIA neither placed the taxes it collected in a segregated fund nor paid them to the IRS does not somehow mean that AIA never collected the taxes in the first place.

\* \* \* \* \* \*

AIA created a trust within the meaning of § 7501 at the moment the relevant payments (from customers ro AIA for excise taxes and from AIA to its employees for FICA and income taxes) were made.

*Begier*, 496 U.S. at 60–61, 110 S.Ct. at 2264.

In the case of *In re Al Copeland Enterprises, Inc.*, 133 B.R. 837, 840 (Bankr. W.D.Tex.1991), *aff'd* 991 F.2d 233 (5th Cir. 1993), the trial court found that the sales

tax receipts flowed from various of the deposit accounts to the concentration account, similar in our case to the operating account. At page 840, the court stated:

> Further, the Debtor's daily combined cash balances during the time period in question, from the date of collection to the date of the petition, never dipped below the amount of the State's sales tax trust fund claims on those days, and the funds existed on the petition date. The lowest intermediate balance rule is satisfied in this case. The State has, therefore, sustained its burden of proof.

In affirming this decision, the Fifth Circuit referred to the trial court's findings per the lowest intermediate balance rule (*Id.* at 235), but it did not have to get into the merits of such conclusion because the remaining appeal only concerned interest on such funds. *Id.*

█ In the present case, it appears that the USDA satisfied its tracing burden under the lowest intermediate balance test since the combined credit card, payroll, Bahamian, and operating account never dipped below the amount of the USDA trust claim. (*See* Trustee Exhibit 1 and entries for period of December 9, 1998, *et seq.*)[3]

Judgment will be entered in accordance with the foregoing opinion.

---

3. If the Court is incorrect in concluding that the INS user fees are not trust funds, then the INS likewise satisfied its tracing obligation.