RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

In re: ARCTIC EXPRESS INC.; D & A
ASSOCIATES LTD.,
            *Debtors.*

_____

OWNER OPERATOR INDEPENDENT DRIVERS
ASSOCIATION, INC.; CARL HARP, as
Representatives of the class and the Certified
Class of Owner-Operators; MICHAEL WIESE,
as Representatives of the class and the
Certified Class of Owner-Operators,
                        *Appellants,*

            *v.*

COMERICA BANK,
                        *Appellee.*

No. 09-3463

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-00056—Algenon L. Marbley, District Judge.

Argued: January 12, 2010

Decided and Filed: March 3, 2011

Before: NORRIS, COOK, and GRIFFIN, Circuit Judges.

_____

### COUNSEL

**ARGUED:** Joyce E. Mayers, THE CULLEN LAW FIRM, PLLC, Washington, D.C.,
for Appellants. Alycia N. Broz, VORYS, SATER, SEYMOUR AND PEASE LLP,
Columbus, Ohio, for Appellee. **ON BRIEF:** Joyce E. Mayers, Paul D. Cullen, Sr., THE
CULLEN LAW FIRM, PLLC, Washington, D.C., for Appellants. Alycia N. Broz,
Michael G. Long, Timothy B. McGranor, VORYS, SATER, SEYMOUR AND PEASE
LLP, Columbus, Ohio, for Appellee.

---

**OPINION**

---

GRIFFIN, Circuit Judge.    Plaintiffs Owner Operator Independent Drivers Association, Inc. ("OOIDA"), and Carl Harp and Michael Wiese, as representatives of the certified class of owner-operators, seek to enforce a final judgment obtained in a class action brought on behalf of independent owner-operator truck drivers against a regulated motor carrier, debtor Arctic Express Inc. ("Arctic"), for maintenance escrow funds owed to the owner-operators.  Plaintiffs assert that defendant Comerica Bank ("Comerica"), through which Arctic kept several accounts and a revolving line of credit, holds a portion of the funds included in the judgment in breach of a statutory trust created pursuant to the Truth-in-Leasing regulations of the Motor Carrier Act, 49 U.S.C. §§ 14101-02, 14704; 49 C.F.R. § 376.12.  Plaintiffs seek restitution of the maintenance escrows allegedly withdrawn unlawfully by Comerica from the trust account as a reduction on Arctic's loan balance.  On cross-motions for summary judgment, the district court granted summary judgment in favor of Comerica and denied plaintiffs' motion.  For the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

This lawsuit has its origins in a $5.5 million class action settlement agreement that Arctic and its affiliate, D & A Associates Ltd. ("D & A"), entered into with plaintiffs, representatives of a certified class of "owner-operators," who independently own, lease, and operate motor carrier equipment for the transportation of commodities. OOIDA is an owner-operator business association with over 141,000 members throughout the United States and Canada.  Harp and Wiese are individual owner-operators who contracted with Arctic to lease motor vehicle equipment.  Arctic is a federally regulated motor carrier that provides transportation services to the shipping public.  D & A is a non-carrier company that leases truck units to independent owner-operators.

The underlying basis for the class action suit was the owner-operators' contractual arrangement with Arctic and D & A. Each owner-operator entered into two agreements with Arctic and D & A – an independent contractor agreement and a lease agreement, pursuant to which the owner-operators provided hauling services to Arctic, using tractor-trailers leased from D & A. Under the agreements, owner-operators were entitled as compensation to a percentage of "gross line haul revenue received from all transportation performed." "Gross line haul revenue" is defined as "amounts received by Carrier [Arctic] from its customer for the transportation of freight." Pursuant to the lease agreement, the individual owner-operator made weekly equipment rental payments to D & A. In addition, under Paragraph 9(a) of the lease, the owner-operator agreed to have Arctic deduct a flat fee of nine cents per mile from his or her compensation on a weekly basis for the purpose of repairing and maintaining the leased trucking equipment.[1] The maintenance payments were kept by Arctic in a maintenance escrow fund. The maintenance escrow deduction was mandatory and was taken from the owner-operator's percentage share of the transportation charge. Paragraph 9(b) of the lease agreement provided:

> Should the amount in the maintenance fund exceed corresponding expenses for maintaining the Equipment, such excess, if any, shall be paid Lessee only upon this Agreement running to term . . . ; should this Agreement not run to term . . . , such excess, if any, will be distributed to Lessee only if Lessee exercises its Option to Purchase as defined in Paragraph 10A.
>
> WARNING: THE MAINTENANCE FUND IS NON-REFUNDABLE. IF THIS LEASE IS TERMINATED, BY EITHER THE LESSEE OR THE LESSOR, BEFORE THE END OF THE TERM DESCRIBED IN SECTION 3, LESSEE, IS NOT ENTITLED TO ANY DISTRIBUTION FROM THE MAINTENANCE FUND EXCEPT UPON EXERCISE OF LESSEE'S OPTION TO PURCHASE.

Under the Arctic agreements, owner-operators received payment in settlement on a weekly basis. Owner-operators were issued a settlement statement – an accounting

---

[1] As the vehicles aged during the lease term, the cost of maintenance rose. Thus, Arctic used the savings garnered from the flat fee at the front end of the lease to cover the higher costs of maintenance at the end of the lease term.

recording the division of total revenue and mileage on a load-by-load basis. The amount of the required maintenance escrow was deducted from compensation prior to payment, and the weekly settlement paid was the net of such deductions. The division of the transportation revenue was determined by the Arctic agreements and accounted for on the settlement statements.

In June 1997, the owner-operators initiated a class action suit (the "Arctic Litigation") against Arctic and D & A in the United States District Court for the Southern District of Ohio, seeking monetary damages and other relief. The certified class of plaintiffs[2] alleged that Arctic and D & A violated the Truth-in-Leasing regulations of the Motor Carrier Act, 49 U.S.C. §§ 14101-02, 14704; 49 C.F.R. § 376 *et seq.*, by failing to return unused maintenance escrow fund balances to the class of owner-operators whose lease agreements with Arctic did not run full term.

In a series of subsequent orders, the district court determined that the nine cents per mile collected for the purpose of maintaining leased equipment was an "escrow fund" as defined under 49 C.F.R. § 376.2(l) and, therefore, the maintenance escrow funds were subject to the requirements of the Truth-in-Leasing regulations; specifically, 49 C.F.R. § 376.12(k), which requires, inter alia, a lessee's (the motor carrier's) accounting of transactions related to the collected funds and the return of escrow balances to the lessor (the owner-operator) within forty-five days from the date of termination of the lease. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 87 F. Supp. 2d 820, 830-31 (S.D. Ohio 2000). The district court granted partial summary judgment to plaintiffs on the issue of liability, holding that Arctic's "transformation of the maintenance fund into 'non-refundable' monies [was] unrelated to the cost of maintenance of the [p]laintiffs' vehicles, and therefore [was] in violation of § 376.12(k)," because "the non-refundable nature of the maintenance fund [was] no more than an early termination penalty thinly disguised by [Arctic]." *Owner Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 159 F. Supp. 2d 1067, 1076 (S.D. Ohio

---

[2]*See Owner Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, No. 2:97-CV-750, 2001 WL 34366624 (S.D. Ohio Sept. 4, 2001) (certifying the Arctic Litigation as a class action).

2001). The district court thus ordered Arctic to return the net unused balance in the escrow accounts to plaintiffs. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.*, 288 F. Supp. 2d 895 (S.D. Ohio 2003); *Owner-Operator Indep. Drivers Ass'n, Inc. v. Arctic Express, Inc.* 270 F. Supp. 2d 990 (S.D. Ohio 2003).

In October 2003, Arctic and D & A filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Ohio, thus halting the Arctic Litigation. Plaintiffs allege that in December 2003, through testimony given in the bankruptcy proceedings, they first learned of Arctic's financing arrangement with Comerica and Comerica's actions in transferring the maintenance escrow funds out of Arctic's depository accounts to repay amounts owed to it pursuant to its loan agreements with Arctic. The particulars of Arctic's banking relationship with Comerica were accurately explained by the district court:

> Arctic and Comerica entered into three revolving credit loan agreements (which established a revolving line of credit), one dated February 4, 1991, one dated May 3, 1993, and the other dated April 29, 1998. The loan arrangement between Arctic and Comerica was in operation continuously from February 1991 through November 1998.
>
> For the 1991 loan agreement, Comerica agreed to lend Arctic up to $500,000 wherein several variables, including the amount of eligible collateral, determined how much Arctic could request be advanced by Comerica at any given time. By May 1993, the revolving loan agreement increased the commitment amount to $2,000,000. By April 1998, the revolving loan agreement increased the commitment amount to $5,500,000. D&A acted as a guarantor in the event of default by Arctic. D&A was not, however, and has never been, a customer of Comerica's and never had an account with Comerica.
>
> At the same time as the loan agreements were in effect, Arctic maintained three accounts with Comerica: (1) a depository/operating account, (2) a zero-balance checking account (also called a controlled disbursement account), and (3) a cash collateral account. The lending relationship was as follows: when Arctic completed a shipment for a customer, Arctic would generate an invoice. If the invoice qualified as an "Eligible Account," as defined in the loan documents, Arctic would include the invoice on its next Borrowing Base Certificate and present it to Comerica. Upon receipt of the Borrowing Base Certificate, and to the extent that the invoiced amounts were "Eligible Accounts," Comerica

would make available to Arctic 80% of the eligible invoice for its line of credit, regardless of whether Arctic intended to use funds advanced. Arctic would then request those funds be advanced to its depository/operating account. So, for instance, if Comerica had an invoice for an Eligible Account worth $100, Comerica would extend credit of up to $80 to Arctic, which would be transferred at Arctic's request to its depository/operating account before receipt of any payments from the customer.

When payments from customers were collected on the accounts receivables, they went directly into Arctic's cash collateral account. Comerica had control over the funds in the cash collateral account, and Arctic could not make withdrawals from the cash collateral account. The collections from customers were applied directly to the loan balance, which increased the availability to draw on the line. The cash collateral account was monitored daily by Comerica, and the balance was applied to the loan on a daily basis. When the invoice amounts were collected in full, Comerica would make available to Arctic the remaining 20% of the Eligible Account through its line of credit. At that point, Arctic would have 100% of the invoice amount available in its line of credit. So, for instance, in the above scenario, if the customer paid the entire invoice, then the full $100 would be available for Arctic to draw on through its line of credit. Arctic could request those funds be transferred into its depository/operating account and use them in any manner it saw fit and for any legitimate purpose necessary to run its business.

Arctic automatically transferred money from the depository/operating account into its zero-balance account to cover checks it wrote. At all other times, the zero-balance account did not carry a balance. Arctic wrote checks from its zero-balance account for any purpose it deemed necessary. Arctic authorized Comerica to debit the depository/operating account once per month to pay for accrued interest and bank fees. Otherwise, the money in the depository/operating account was for Arctic's unencumbered use and remained at its disposal. No loan payments to Comerica were ever deducted from the depository/operating account.

Pursuant to the loan agreements, Arctic pledged as collateral for the loans, among other assets, all accounts receivable for motor carrier services provided to customers and proceeds from the accounts receivable. The primary purpose of the collateral was to provide a source for recovery of the loan balance in the event Arctic defaulted on its loan and the collateral had to be sold. Though accounts receivable collections were credited against Arctic's loan balance, this collateral was never liquidated, as liquidation occurs in the event of a default, and there was no default by Arctic.

*Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 615 F. Supp. 2d 692, 695-96 (S.D. Ohio 2009) (footnotes omitted).[3]

In January 2004, plaintiffs commenced an adversary proceeding against Arctic, D & A, and Comerica in the bankruptcy court, seeking return of the escrow funds owed to the Arctic Litigation class members. The bankruptcy court lifted the automatic stay to allow the district court to complete the Arctic Litigation and liquidate the class claims, and, in May 2004, plaintiffs entered into a $5.5 million settlement agreement with Arctic and D & A, which was approved by the district court in July 2004. The settlement equaled the total amount of maintenance escrow funds, plus interest, owed by Arctic and D & A to the owner-operators; however, the settlement agreement further provided that "[i]n no event shall the [owner-operators] recover or seek to recover more than $900,000 from Arctic." After entry of the judgment and finalization of Arctic's plan of reorganization, the district court withdrew the bankruptcy reference over the adversary proceeding, and plaintiffs' action against Comerica seeking enforcement of the Arctic Litigation judgment was removed to the district court.

Plaintiffs thereafter twice amended their complaint, ultimately setting forth a single count seeking restitution or disgorgement of the maintenance escrow funds deposited by Arctic into Comerica's accounts and purportedly used by Comerica to pay down Arctic's indebtedness.[4] In denying, in part, Comerica's motions to dismiss plaintiffs' complaints, the district court opined that the funds held in escrow under 49 C.F.R. § 376.12(k) were subject to a statutory trust for plaintiffs' benefit, and plaintiffs were entitled to pursue a common law claim against Comerica for restitution. *Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Inc.*, No. 2:05-CV-00056, 2006 WL 1339427, at *4 (S.D. Ohio May 16, 2006) (unpublished) (footnote omitted); *see also Owner Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank*, 540 F. Supp. 2d 925, 931-32 (S.D. Ohio 2008).

---

[3]In late 1998, Arctic transferred its loans to Congress Financial and terminated its banking relationship with Comerica. *Id*. at 696-97. Arctic used funds from its new line of credit with Congress Financial to pay off its outstanding loan balance of $4.7 million to Comerica. *Id*. at 697.

[4]Plaintiffs are not seeking to recover any funds withheld before the 1993 loan was executed.

The parties filed cross-motions for summary judgment. Comerica disputed the existence and alleged breach of a statutory trust and asserted statute of limitations and bona fide purchaser defenses. It maintained that if a trust attached to any of Arctic's bank accounts, it attached to funds in the depository/operating account when the nine cents per mile was deducted by Arctic from the owner-operator's compensation; in other words, Arctic was withholding the maintenance fees, not Comerica. Comerica asserted that the funds it credited to the Arctic loan balance from the cash collateral account were not subject to the trust because the trust did not exist yet.

Conversely, plaintiffs argued that the trust was created when funds were deposited by customers into the cash collateral account. Because the maintenance escrow fees were deducted from compensation, which was a percentage of the amount received in the cash collateral account, the escrow fees were a part of the payments deposited into the cash collateral account. Comerica, in turn, collected Arctic's receivables, which included the maintenance escrow funds, and applied the receivables to pay down Arctic's indebtedness. Plaintiffs therefore contended that Comerica unlawfully retained the maintenance escrow funds as a reduction on Arctic's loan balance.

In an Opinion and Order issued on March 16, 2009, the district court granted Comerica's motion for summary judgment and denied plaintiffs' cross-motion. *See OOIDA v. Comerica Bank*, 615 F. Supp. 2d at 694. The court found, in pertinent part, that a genuine issue of material fact existed as to whether plaintiffs exercised reasonable diligence in discovering facts giving rise to the claim against Comerica, precluding summary judgment on the basis of the statute of limitations. *Id*. at 701. The district court further held that the statutory trust attached only to the funds in Arctic's depository/operating account:

> This Court finds that the deposits by customers into the cash collateral account did not create an escrow fund, because until compensation was paid to owner-operators, nothing had been withheld from (or deposited by) them. Just because owner-operators' compensation was calculated as a percentage of the amount received by customers does not establish an escrow fund in the cash collateral account. It was only once the

maintenance escrow fees were deducted (i.e. once the fees were "deposited" by the owner-operators) that an escrow fund was created. . . . Until the first settlement check was paid to an owner-operator, that owner-operator did not have an escrow fund account because there was nothing to withhold from the settlement amount. And only when an escrow fund came into existence was a statutory trust established that attached to all funds commingled with the escrow fund. Thereafter, the statutory trust attached to funds in the depository/operating account when the nine-cents-per-mile was deducted from owner-operator's compensation, but did not attach to the funds in the cash collateral account.

*Id*. at 706 (emphasis omitted).

The district court determined that

[a]s the trust only attached to the depository/operating account, there could only be a breach of trust if either the funds deposited in that account were unlawfully encumbered (i.e. unavailable for Arctic to use to fund the maintenance escrow fund), or if funds in that account were unlawfully withdrawn.

* * *

The evidence shows that: (1) the funds in the depository/operating account, other than the funds used to pay interest and bank fees, were freely available to satisfy outstanding obligations to Plaintiffs; and (2) the interest and fees charged [by Comerica] were commercially reasonable. Arctic's deposits into the depository/operating account and Arctic's allowance of Comerica to withdraw from that account to pay interest and fees were not in breach of trust. Comerica cannot be liable for receiving funds in breach of trust because the trustee's transfer of funds did not constitute a breach of trust.

*Id*. at 706-08.

Plaintiffs now timely appeal the district court's grant of summary judgment in favor of Comerica and the denial of their cross-motion for summary judgment.

II.

We conduct de novo review of the district court's summary judgment order. *Med. Mut. of Ohio v. k. Amalia Enters. Inc.*, 548 F.3d 383, 389 (6th Cir. 2008). "In reviewing a grant of summary judgment on cross-motions seeking such relief, we apply the same legal standards as the district court: whether, with the evidence viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact, so that the moving party is entitled to a judgment as a matter of law." *United States v. Petroff-Kline*, 557 F.3d 285, 290 (6th Cir. 2009) (citation omitted); *see* Federal Rule of Civil Procedure 56(c)(2).

On appeal, plaintiffs maintain that the statutory trust attached when customers made payments into the cash collateral account; therefore, any money paid from that account, including funds used to pay down Arctic's loan obligations to Comerica, included trust assets. Plaintiffs contend that Arctic breached its fiduciary duties when it used plaintiffs' trust property to reduce its loan balance, and never drew those funds from Comerica to return plaintiffs' maintenance escrows, in violation of the Truth-in-Leasing regulations. We agree.

However, it is necessary that we first re-examine the district court's threshold determination – challenged by Comerica – that 49 C.F.R. § 376.12(k) impressed the maintenance escrow funds with a statutory trust for plaintiffs' benefit, thereby giving rise to plaintiffs' solitary claim against Comerica for restitutionary relief stemming from Arctic's alleged breach of trust. This is a novel issue. Comerica contends that while Arctic may have violated the terms of its contractual obligations by failing to return the maintenance escrow funds to the individual owner-operators, neither Arctic's lease agreements nor the escrow provisions of the Truth-in-Leasing regulations refer to a "trust" in express terms; and, Comerica asserts, if Congress had intended to create a statutory trust for the benefit of the owner-operators, it would have explicitly incorporated the term "trust" into 49 C.F.R. § 376.12(k), as it has in other statutory schemes.

Regulations promulgated to effect the purpose of a statute are to be construed in accordance with the well-established principles of statutory construction:

> As with all matters of regulatory interpretation, we look first to the plain and unambiguous meaning of the regulation, if any. *See Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 910 (6th Cir. 2000) (quoting *Bartlik v. U.S. Dep't of Labor*, 62 F.3d 163, 165-66 (6th Cir. 1995)) ("We read statutes and regulations with an eye to their straightforward and commonsense meanings," and where the regulation's language reveals an "unambiguous and plain meaning . . . , our task is at an end.").

*Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Serv., Inc.*, 481 F.3d 337, 344 (6th Cir. 2007). If the terms of a regulation are ambiguous, "[w]e next look to the regulatory scheme, reading the regulation in its entirety to glean its meaning." *Id.*

Although "[t]he common law of trusts is not binding on Congress," *Begier v. IRS*, 496 U.S. 53, 62 n.4 (1990), it provides a useful "'starting point' for analysis in some situations," so long as it is not "inconsistent with the language of the statute, its structure, or its purposes." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999) (internal citation and quotation marks omitted). "In the strict, traditional sense, a trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries." RESTATEMENT (THIRD) OF TRUSTS § 2 cmt. f (2003). Thus, where "a person has or accepts possession of personal property with the express or implied understanding that he is not to hold it as his own absolute property, but is to hold and apply it for certain specific purposes or for the benefit of certain specified persons, a valid and enforceable . . . trust exists." *In re Cannon*, 277 F.3d 838, 850 (6th Cir. 2002) (citation omitted).

The "failure to expressly designate the relationship as one of trust does not necessarily negate its existence." *In re Penn Cent. Transp. Co.*, 486 F.2d 519, 524 (3d Cir. 1973) (en banc); *see also Fed. Ins. Co. v. Fifth Third Bank*, 867 F.2d 330, 333 (6th Cir. 1989) ("It is a well-settled principle of law . . . that if one person pays money to another it depends upon the manifested intention of the parties whether a trust or a debt

is created."); RESTATEMENT (THIRD) OF TRUSTS § 5 cmt. a (2003) ("A property arrangement may constitute a trust . . . even though such terms as 'trust' or 'trustee' are not used . . . . Conversely, use of the word 'trust' or 'trustee' does not necessarily mean that a trust relationship is involved.").

"An escrow arrangement, like all express trusts, is a contractual relationship, in which disbursement by the trustee is conditioned upon the happening of a specified occurrence." *In re Dameron*, 155 F.3d 718, 723 (4th Cir. 1998) (applying Virginia substantive law). "Where the owner of property delivers in escrow the property . . . , the title to the property does not pass until the condition has occurred, but the delivery is irrevocable and creates immediate conditional rights in the transferee. Where the owner manifests an intention that the transferee is to hold the property in trust, a trust may be created at the time of the delivery in escrow." RESTATEMENT (SECOND) OF CONTRACTS § 103 cmt. b (1981).

These common law principles apply to the formation of statutory trusts:

A trust is created when a settlor conveys property to a trustee with a manifest intent to impose a fiduciary duty on that person requiring that the property be used for a specific benefit of others. *See Restatement (Second) of Trusts* §§ 2, 17, 23 & 23 cmt. (a) (1959). That Congress may create a trust through the manifestation of an intent to create a fiduciary relationship is beyond dispute. *See Lassen* [*v. Arizona ex rel. Ariz. Highway Dep't*, 385 U.S. 458, 460 (1967)] . . . . Congress need not use any particular form of words in expressing its intent to create a trust, and the absence of the words "trust" or "trustee" in the conveyance is not determinative of the question of whether Congress intended to create a trust. Instead, the creation of a trust depends on whether the relevant statutory provision contains an enumeration of duties which would justify a conclusion that Congress intended to create a trust relationship.

*Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 633-34 (10th Cir. 1998) (citations and internal quotation marks omitted).

There are numerous examples of statutory trusts, many of which leave no doubt as to Congress's intent to create a trust through explicit use of that term in the language of a statute or regulation. *See, e.g.*, the Perishable Agricultural Commodities Act

("PACA"), 7 U.S.C. § 499e(c)(2) ("Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents."); the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 196(b) ("All livestock purchased by a packer in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, shall be held by such packer in trust for the benefit of all unpaid cash sellers of such livestock until full payment has been received by such unpaid sellers . . . ."); the Internal Revenue Code, 26 U.S.C. § 7501(a) ("Whenever any person is required to collect or withhold any internal revenue tax from any other person and to pay over such tax to the United States, the amount of tax so collected or withheld shall be held to be a special fund in trust for the United States.").[5]

In the case of other statutes and regulations, the courts have held that a statutory trust exists, despite the absence of such express terminology. For instance, in *United States v. Mitchell*, 463 U.S. 206 (1983), the Supreme Court held that certain timber management statutes, 25 U.S.C. §§ 406-07, 466, and accompanying regulations, which set forth the comprehensive responsibilities of the federal government in managing the harvesting of timber on Indian reservations, established a statutory trust for the benefit of the Indian tribes:

> The language of these statutory and regulatory provisions directly supports the existence of a fiduciary relationship. For example, § 8 of the 1910 Act, as amended, expressly mandates that sales of timber from Indian trust lands be based upon the Secretary's consideration of "the needs and best interests of the Indian owner and his heirs" and that proceeds from such sales be paid to owners "or disposed of for their benefit." 25 U.S.C. § 406(a). . . .

---

[5]For other examples of statutory trusts, *see generally* G.G. BOGERT & G.T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 246 (rev. 2d ed. 1984).

> Moreover, a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds).

*Mitchell*, 463 U.S. at 224-25 (footnotes omitted).

In *Branson Sch. Dist. RE-82*, the Tenth Circuit Court of Appeals held that the Colorado Enabling Act § 14, 18 Stat. 474-76 (1875), "contains a sufficient enumeration of duties to indicate Congress's intent to create a fiduciary relationship between the state of Colorado and its common schools with respect to the management of the school lands." 161 F.3d at 634. In the enabling act, Congress "prescribed (1) how the school lands are to be disposed, (2) at what minimum price, (3) how the income from these sales is to be held, (4) what may be done with the interest on that capital holding, and (5) Congress has provided for the permanence of the benefit of these assets for the common schools." *Id*. The Tenth Circuit found these explicit restrictions to be "determinative evidence of Congress' intent to create a trust." *Id*.

Similarly, in the present case, 49 C.F.R. § 376.12(k), through its comprehensive delineation of responsibilities, imposes strict fiduciary obligations on motor carriers, such that it places the motor carriers in a position of trust vis-a-vis owner-operators with regard to the handling of escrow funds. 49 C.F.R. § 376.2(l) defines an "escrow fund" as "[m]oney deposited by the lessor [owner-operator] with either a third party or the lessee to guarantee performance, to repay advances, to cover repair expenses, to handle claims, to handle license and State permit costs, and for any other purposes mutually agreed upon by the lessor and lessee." Section 376.12(k) provides that if escrow funds are required by the terms of the lease, the lease "shall specify":

> (1) The amount of any escrow fund or performance bond required to be paid by the lessor to the authorized carrier or to a third party.
>
> (2) The specific items to which the escrow fund can be applied.
>
> (3) That while the escrow fund is under the control of the authorized carrier, the authorized carrier shall provide an accounting to the lessor of

any transactions involving such fund.  The carrier shall perform this accounting in one of the following ways:

> (i) By clearly indicating in individual settlement sheets the amount and description of any deduction or addition made to the escrow fund; or

> (ii) By providing a separate accounting to the lessor of any transactions involving the escrow fund. This separate accounting shall be done on a monthly basis.

(4) The right of the lessor to demand to have an accounting for transactions involving the escrow fund at any time.

(5) That while the escrow fund is under the control of the carrier, the carrier shall pay interest on the escrow fund on at least a quarterly basis. . . .

(6) The conditions the lessor must fulfill in order to have the escrow fund returned.  At the time of the return of the escrow fund, the authorized carrier may deduct monies for those obligations incurred by the lessor which have been previously specified in the lease, and shall provide a final accounting to the lessor of all such final deductions made to the escrow fund.  The lease shall further specify that in no event shall the escrow fund be returned later than 45 days from the date of termination.

49 C.F.R. § 376.12(k).

The district court construed these regulatory provisions as creating a statutory trust for the benefit of plaintiffs, holding in pertinent part:

> Under the contract between Plaintiffs and Arctic, this Court found [in the Arctic Litigation] that the only reason anyone could withdraw money from Arctic's bank account that held the escrow funds was to pay for repairs and maintenance of the individual owner operator's leased equipment. The nature of the relationship between Arctic and Plaintiffs put Arctic in the same position with respect to the individual drivers as a trustee has toward beneficiaries of an express trust.  The owner operators entrusted their money to Arctic and relied upon Arctic to safeguard it and only to distribute it for legitimate purposes under the agreement.

*OOIDA v. Comerica Inc.*, 2006 WL 1339427, at *4 (citations omitted).

In reaching this conclusion, the district court relied in part upon *In re Intrenet, Inc.*, 273 B.R. 153 (S.D. Ohio 2002), in which the bankruptcy court held, in the context

of a Chapter 11 adversary proceeding, that funds deposited by owner-operators into an escrow account established pursuant to § 376.12(k) were subject to a statutory trust and were not the property of the debtors-carriers' bankruptcy estate. Noting that the Truth-in-Leasing regulations "were enacted for the protection of owner-operators from abusive practices of carriers, particularly with regard to escrow funds," the bankruptcy court determined that the owner-operators were entitled to return of the escrow funds, even though the funds were not held with a third party.[6] 273 B.R. at 156-57 (citing *Lease and Interchange of Vehicles*, 131 M.C.C. 141 (1979); *Lease and Interchange of Vehicles*, 129 M.C.C. 700 (1978)). In so holding, the *Intrenet* court rejected the defendants' contention that "the Debtors simply made 'accounting entries' relative to the funds and that the Owner-Operators [were] 'no more than potential unsecured creditors,'" opining that this argument "undermines a primary goal of the federal Truth-in-Leasing regulations." *Id.* at 158.

We agree with the district court and the *Intrenet* court that 49 C.F.R. § 376.12(k), when viewed in the historical context in which it was enacted, implicitly creates a statutory trust for the benefit of owner-operators.

The Truth-in-Leasing escrow provisions state that they "shall be adhered to and performed by the authorized carrier." 49 C.F.R. § 376.12. They require the lease agreements to specify the amount of the escrow; how the escrow funds can be used; allow the carrier to take amounts from the escrow only for an actual obligation incurred by the individual owner-operator consistent with the purposes specified in the agreement; require the carrier to continually account to the owner-operator for all transactions involving the escrow funds; and, at termination of the contract, mandate that the carrier return owner-operator funds to the individual driver within 45 days. 49 C.F.R. § 376.12(k)(1)-(6). Only actual obligations of the owner-operator consistent with the purposes specified in the agreement may be deducted from the escrow; otherwise,

---

[6]The *Intrenet* court accurately observed that, consistent with trucking industry practices, "the regulations contemplate an escrow regardless of who holds the funds." *In re Intrenet, Inc.*, 273 B.R. at 157 (citing 49 C.F.R. § 376.2(1)).

the unused contribution must be returned to the owner-operator.   49 C.F.R. § 376.12(k)(6).

"Congress's substantive purpose in authorizing the Truth-in-Leasing regulations was to protect owner-operators." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc*., 367 F.3d 1108, 1115 (9th Cir. 2004).  Following a nation-wide strike by independent truckers during the "winter of discontent" in 1973, Congress and the Interstate Commerce Commission ("ICC") conducted a series of hearings, which uncovered numerous problems and abuses suffered by the independent truckers. *Global Van Lines, Inc. v. ICC*, 627 F.2d 546, 548 (D.C. Cir. 1980).  The owner-operators "were found to be caught in a continuing cost crunch, faced with rising costs, inflexible income, difficulties in obtaining long-term financing and questionable industry practices." *Id*. (internal quotation marks and citation omitted).  Specifically, with regard to the drivers' escrow deposits,

> [t]he prevalent practice in truck leasing has been to require independent truckers to deposit a specified sum in escrow with the regulated carrier. The various investigations by Congress and the [ICC] flagged these accounts as a major source of problems for the independents.  Delays in obtaining refund of the escrow deposits create serious cash-flow problems for the independent who wants to enter a new agreement but has substantial sums tied up in escrow funds still pending from prior agreements.  Sometimes, complained the independents, the deposit was not given back at all.

*Id*. at 551 (citation omitted).  Consequently, in 1979, the ICC promulgated the Truth-in-Leasing regulations.  The stated objective of these provisions was

> to promote truth-in-leasing – a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts signed by both parties; . . . to eliminate or reduce opportunities for skimming and other illegal or inequitable practices [by motor carriers]; and . . . to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry.

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Ledar Transp.*, No. 00-0258-CV-W-2-ECF, 2000 WL 33711271, at *3 (W.D. Mo. Nov. 3, 2000) (unpublished) (alteration in

original) (quoting *Lease and Interchange of Vehicles*, 131 M.C.C. at 142). "The method selected to achieve this goal was to require that certain terms be included in every lease between carriers and owner-operators," *Swift Transp. Co., Inc.*, 367 F.3d at 1115, and "also require[] the return of escrow deposits within 45 days after termination of the leasing arrangement." *Global Van Lines, Inc.*, 627 F.2d at 549.

These circumstances surrounding the enactment of the escrow regulation reinforce our conclusion that a fiduciary relationship exists between the carrier and the owner-operators, effectively placing the motor carrier in the same position as the trustee of an express trust.[7]   Section 376.12(k), with its remedial purpose, parallels the trust provisions of the PSA and the PACA in its goal of protecting the interests of an important segment of national commerce – in this case, the livelihood of independent truck drivers. *See, e.g., Overton Distribs., Inc. v. Heritage Bank*, 340 F.3d 361, 365 (6th Cir. 2003) (the PACA statutory trust "protects the sellers against financing arrangements made by merchants, dealers, or brokers who encumber or give lenders a security interest in the [agricultural] commodities or the receivables or proceeds from the sale of the commodities, thus giving the claims of these sellers precedence over those of secured creditors").

Comerica nonetheless argues that because § 376.12(k) permits the commingling of funds and calls for the payment of interest on the escrow funds, these provisions evidence a debt rather than a trust. While in some circumstances the payment of interest may indicate a debtor-creditor relationship, it is by no means determinative. *In re Penn Central*, 486 F.2d at 524. "Interest payments indicate a debtor-creditor relationship because they are the usual contractually negotiated *quid pro quo* for a loan." *In re Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1061 (3d Cir. 2003). However, where the payment of interest is not negotiated by the parties, but instead is set by statute or regulation, it is not an accurate indicator of a debtor-creditor relationship. *Id.*

---

[7]Comerica's reliance on *In re Brock*, Nos. 08-01493-JDP, 08-6087, 2009 WL 1559528 (Bankr. D. Idaho June 2, 2009) (unpublished) is misplaced. In that case, the bankruptcy court held that 49 C.F.R. § 376.12(f), which addresses written lease requirements related to paperwork and delivery documents, did not create a statutory trust relationship under the bankruptcy code. Subsection (f) is separate and distinct from the escrow provisions governing the administration of the owner-operators' escrow deposits.

Under the Truth-in-Leasing regulations, the payment of interest at a set rate on the escrow funds was required by the ICC to make the owner-operators whole; it was not negotiated by the drivers in consideration for a loan to the carrier. *See Lease and Interchange of Vehicles*, 131 M.C.C. at 153-54; *Lease and Interchange of Vehicles*, 129 M.C.C. at 726-27. It therefore does not contradict a trust relationship.

Likewise, contrary to Comerica's argument, the absence of a requirement that the carrier segregate escrow funds is not determinative of whether a trust was intended and, in this case, merits little weight in enforcing plaintiffs' rights. The proposed requirement to segregate escrow funds was deleted by the ICC from the final version of § 376.12(k) to "assist the lessors in meeting their own, often pressing needs for ready cash." *Lease and Interchange of Vehicles*, 129 M.C.C. at 725. Additional safeguards, in the form of more rigorous accounting requirements, were added, and the modification did not serve to enhance the carriers' interest in these funds. *Id.* at 726. The commingling of the escrow funds with other monies therefore does not, under these circumstances, defeat a trust relationship. *See Begier*, 496 U.S. at 60-62 (holding that the segregation of funds was not a prerequisite to the establishment of a statutory trust under the Internal Revenue Code); 7 C.F.R. § 46.46(b) (2007) ("[PACA] [t]rust assets are to be preserved as a non-segregated 'floating' trust. Commingling of trust assets is contemplated."). *Cf. In re Cannon*, 277 F.3d at 850-51 (holding that in light of the impracticality of establishing separate accounts for each client, the commingling of client funds held in an express trust in escrow accounts of the debtor-attorney did not alter their character).

In sum, as the district court properly determined, the premise upon which plaintiffs' claim against Comerica depends – the existence of a statutory trust – is sound, thus paving the way for plaintiffs' action for restitutionary relief against Comerica.[8]

---

[8]Our conclusion that the Truth-in-Leasing regulations create a statutory trust eliminates the need to consider plaintiffs' alternative constructive trust theory and renders inapposite plaintiffs' comparison to the interline trust doctrine, pursuant to which "transportation and freight charges, when collected [by one [interline] motor carrier on behalf of another for services that the latter has performed], are held in trust for the [latter carrier]." *Parker Motor Freight, Inc. v. Fifth Third Bank*, 116 F.3d 1137, 1140 (6th Cir. 1997) (first and third alteration in original) (citation omitted); *see also In re Ann Arbor R.R. Co.*, 623 F.2d 480 (6th Cir. 1980). "The methods of accounting and payment for interline services . . . are not controlled by statute but by industry accounting practices and rules." *In re Penn Central*, 486 F.2d at 521. Thus, unlike the present case, which involves a federal regulatory scheme of reimbursement, the interline trust

III.

The question remains whether plaintiffs can recover the escrow funds impressed with a statutory trust from Comerica.  The regulations provide no express guidance in this regard, but common law trust principles do:

> [I]t has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty.  The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom.

*Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc*., 530 U.S. 238, 250-51 (2000) (authorizing an action for restitution under the Employment Retirement Income Security Act ("ERISA") against a non-fiduciary transferee of tainted assets) (citations omitted); *see also In re Cannon*, 277 F.3d at 854 (noting that a bona fide purchaser for value without notice of a breach of trust takes free of the trust) (citation omitted); *Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts*, 954 F.2d 299, 303-06 (5th Cir. 1992) (federal common law of restitution afforded employer right to recover overpayments to multi-employer trust funds under ERISA); RESTATEMENT (SECOND) OF TRUSTS § 74 cmt. a (1959) ("The beneficiary of a trust has an equitable interest in the subject matter of the trust, and in its proceeds if it is disposed of, which gives him priority over the claims of the general creditors of the trustee and over transferees who are not bona fide purchasers.").

In the case at hand, the district court held that the prerequisite breach of trust by Arctic did not occur so as to expose Comerica to liability.  The court found that plaintiffs' trust interest in the funds on deposit with Comerica did not attach to plaintiffs' percentage interest in Arctic's accounts receivable deposited in the cash collateral account; rather, the trust attached to funds in the depository/operating account at the time

---

doctrine is "rooted in . . . federal common law . . . , not a statute or regulation."  *Parker Motor Freight, Inc*., 116 F.3d at 1140.

that Arctic paid owner-operator compensation net of the maintenance escrow deduction. *OOIDA v. Comerica Bank*, 615 F. Supp. 2d at 706. The district court reasoned that because no funds other than commercially reasonable interest and fees were withdrawn by Comerica from the depository/operating account, none of plaintiffs' trust property was transferred to the bank in breach of Arctic's trust duties to plaintiffs. However, we agree with plaintiffs that the district court's analysis misconstrues the loan arrangement and common law trust principles.

In the absence of on-point authority, case law addressing the priority rights of secured creditors to funds impressed with a statutory PACA trust is instructive. PACA trusts were created by Congress to correct the perceived inequity to unsecured produce sellers caused by financing arrangements between produce purchasers and their lenders, by giving the sellers precedence over the claims of secured creditors. *See Overton Distribs., Inc.*, 340 F.3d at 365. PACA trustees "are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities." 7 C.F.R. § 46.46(d)(1). The interpretation of PACA trust interests is guided by general trust principles to the extent there is no conflict with the statute, *Consumers Produce Co. v. Volante Wholesale Produce, Inc.*, 16 F.3d 1374, 1381 (3d Cir. 1994); and, as is the case with owner-operator escrow funds, PACA does not preclude the commingling of trust funds or the conversion of trust property into a different form of assets. *Nickey Gregory Co., LLC v. AgriCap, LLC*, 597 F.3d 591, 598 (4th Cir. 2010).

In *Nickey Gregory*, the sellers of perishable agricultural commodities brought suit under the PACA to recover sums owed to them for the sale of produce to Robison Farms, LLC, a bankrupt produce distributor. The defendant, AgriCap, LLC, was a finance company that provided secured financing to Robison Farms for working capital. *Id.* at 594. The plaintiffs sought to disgorge the proceeds of Robison Farms' accounts receivable held by AgriCap as collateral to secure repayment of monies advanced by AgriCap to Robison Farms. *Id.* The plaintiffs claimed that PACA created a trust for their benefit over the proceeds of their produce, including the accounts receivable that

Robison Farms used for collateral in its arrangement with AgriCap, and, therefore, they possessed a superior interest in the proceeds held by AgriCap. *Id.* The Fourth Circuit Court of Appeals agreed, stating:

> When Robison Farms transferred a receivable to AgriCap, AgriCap advanced, as a loan, 80% of the receivable's face value. When AgriCap collected on the receivable, . . . it retained (1) 80% as repayment of the loan; (2) a collection fee of 1.5%; and (3) interest at a rate of the lesser of 12% or 6% over prime for the period during which the 80% amount was outstanding. It then remitted the balance to Robison Farms. AgriCap was thus only a lender and collection agent, not a purchaser of the accounts receivable that assumed the risks of collecting on the receivables. Because these substantive aspects of the transaction are inconsistent with an outright sale of the assets, we agree with the district court that the transaction was in its essence a loan in the form of a revolving line of credit secured by accounts receivable.
>
> * * *
>
> [T]he distinction between a sale and a loan controls the issue of whether AgriCap purchased the assets free of the PACA trust or merely held the assets to collateralize its loans to Robison Farms, in which case the receivables would have remained subject to the PACA trust and would have been required, by the terms of regulations, to be made "freely available" to pay obligations to commodities sellers. 7 C.F.R. § 46.46(d)(1). Because we conclude that the transaction in this case was a loan, we also conclude that the accounts receivable and their proceeds never left the PACA trust and that therefore the accounts receivable and their proceeds had to be made available for payment first to the claims of unpaid PACA creditors, such as [plaintiffs]. The district court therefore ruled properly that AgriCap must disgorge from the assets of the PACA trust amounts sufficient to pay unpaid PACA creditors.

*Id*. at 603 (emphases removed).

The Fourth Circuit rejected AgriCap's contention that "whether the transaction was a loan is not important so long as the transaction was commercially reasonable," *id*. at 604,[9] and affirmed the judgment in favor of the plaintiffs because AgriCap failed to

---

[9]The court found the cases upon which AgriCap relied to be distinguishable because they either involved a factoring relationship in which the receivables were actually sold and the commercial reasonableness of the sale was therefore a legitimate consideration, *see Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring Inc*., 251 F.3d 1268, 1271 (9th Cir. 2001), or dealt with checking accounts with overdraft privileges, an arrangement that may have actually facilitated the prompt payment

establish that it was a bona fide purchaser for value and without notice. *Id*. at 605, 608. *See also A & J Produce Corp. v. Bronx Overall Econ. Dev. Corp*., 542 F.3d 54, 58 (2d Cir. 2008) ("A creditor holding only a security interest [in accounts receivable] . . . retains that interest subject to the rights of the [PACA] trust beneficiaries.") (internal quotation marks and citation omitted); *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 417-18 (5th Cir. 2003) (where "the so-called factoring agreement . . . is the functional equivalent of a secured lending agreement, . . . [the] commercially reasonable analysis is inapplicable" and the lender takes PACA trust assets subject to the rights of the produce supplier); *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc*., 67 F.3d 1063, 1069 (2d Cir. 1995) ("Because [the secured lender] held only a security interest in [the PACA dealer's] accounts receivable, and did not purchase those accounts for value, its interest is subject to the rights of the PACA trust beneficiaries.").

The rationale of the Fourth Circuit's decision in *Nickey Gregory* is transferable to the case at bar, which involves a similar revolving loan agreement secured by Arctic's accounts receivable. Arctic granted Comerica a security interest in its accounts receivable, inventory, and other assets, including real estate, as collateral for the loan. The funds Comerica advanced to Arctic were not funds paid directly from Arctic's customers, but a formula-based credit determined by the value of the accounts receivable and other assets of Arctic. Pursuant to the Advance Formula Agreements executed in conjunction with the loan agreements, the formula for calculating the line of credit included, among other assets, eighty percent of the value of Arctic's eligible accounts receivable.

Under the terms of the loan, Arctic submitted to Comerica a list of customer invoices that qualified as "eligible accounts," as defined by the loan documents. Upon receipt of this submission, deemed a "borrowing base certificate," Comerica would make eighty percent of the eligible invoice amounts available to Arctic by transferring the

---

of PACA creditors, *see D.M. Rothman & Co., Inc. v. Korea Commercial Bank of N.Y.*, 411 F.3d 90 (2d Cir. 2005); *E. Armata, Inc. v. Korea Commercial Bank of N.Y.*, 367 F.3d 123, 134 (2d Cir. 2004); *Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33 (2d Cir. 2004).

funds, at Arctic's request, to the depository/operating account. When payment was received from Arctic's customers, the accounts receivable were deposited into Arctic's cash collateral account, controlled solely by Comerica, either directly by remittance from the customer or by Arctic after receipt of payment from the shipping customer. Comerica processed the deposits to the cash collateral account on a regular basis, applying the funds directly to the loan balance. Comerica made the remaining amount available to Arctic, either by transferring the amount to Arctic's operating account or increasing Arctic's availability under the line of credit. Arctic could request that such funds be transferred into its depository/operating account for its use for any legitimate purpose necessary to run its business.

As its operating expenses came due, Arctic applied to Comerica to borrow only amounts sufficient to cover its current obligations. Checks were issued before funds were drawn on the line of credit. To cover checks written on the controlled-disbursement account, Arctic automatically transferred money from the depository/operating account, requested a draw on its line of credit, or both. The debit from the checks and the credit from the advance both posted against the operating account. At all other times, the controlled-disbursement account did not carry a balance. Among the checks written from the controlled-disbursement account were the owner-operators' weekly settlement payments; Arctic borrowed from Comerica only the net amount owed – the owner-operators' percentage share of the transportation revenue, less deductions that included the nine cents per mile for the maintenance escrow fund.

We agree with plaintiffs that their trust interest in the maintenance escrows attached when the customers' payment for services, Arctic's accounts receivable, were deposited in the cash collateral account. The district court's conclusion that the statutory trust attached to funds in the depository/operating account when the nine cents per mile was deducted from owner-operators' compensation, but did not attach to the funds in the cash collateral account, is illusory. Although the funds flowed to Arctic from its receivables, and Arctic had discretionary, "unencumbered" use of the funds in the depository/operating account, the funds themselves were not unencumbered. The

accounts receivable deposited into the cash collateral account were taken by Comerica and applied directly to reduce Arctic's outstanding loan balance. Thus, whether the draw on the line of credit passed through an operating account before directly funding the checks is immaterial. Arctic compensated the owner-operators for an amount net of the maintenance escrow, and, instead of funding the escrows through its line of credit, it applied the trust funds to reduce its loan balance, without returning the unused escrow funds to plaintiffs as required under 49 C.F.R. § 376.12(k). By operation of the loan agreements, Comerica collected the nine cents per mile in maintenance escrows along with Arctic's receivables and, in sweeping Arctic's cash collateral account, used the maintenance escrows to repay amounts borrowed by Arctic under the loan agreements. Consequently, Arctic breached its trust obligations to plaintiffs by encumbering the escrow funds, and dissipating the trust assets, through its lending relationship with Comerica. Comerica must therefore disgorge the trust property received in breach of trust unless it can establish a viable defense. *See Nickey Gregory*, 597 F.3d at 605.

## IV.

Comerica argues that it is a bona fide purchaser for value and therefore takes the property free of the trust. Even if property was transferred in breach of trust, general trust principles permit a bona fide purchaser to retain such property. *C.H. Robinson Co. v. Trust Co. Bank, N.A.*, 952 F.2d 1311, 1313 (11th Cir. 1992); RESTATEMENT (SECOND) OF TRUSTS § 284(1). "Like any transferee, secured lenders will be forced to return trust property they have received unless they can establish their status as bona fide purchasers, i.e., that they received the property for value and without notice of breach of trust." *Robinson*, 952 F.2d at 1315 (footnote omitted). "Ordinarily, the transfer of trust assets in satisfaction of an antecedent debt is not for value. '[I]f the trustee transfers trust property in consideration of the extinguishment of a pre-existing debt or other obligation, the transfer is not for value.'" *Id.* at 1314 (alteration in original) (quoting RESTATEMENT (SECOND) OF TRUSTS § 304(1)). Although an exception to this principle exists if the property transferred is money, *id.*, "transfers of trust property such as accounts receivable are not for value under traditional trust law." *Id.* at 1315.

For the reasons succinctly set forth by the Fourth Circuit in *Nickey Gregory Co.*, Comerica cannot avail itself of the bona fide purchaser defense because it is not a bona fide purchaser "for value":

> AgriCap contends that it received Robison Farms' accounts receivable "for value" because each time Robison Farms transferred a receivable to AgriCap, AgriCap paid Robison Farms 80% of the receivable's face value. This argument, however, fails for the same reason that AgriCap is incorrect to characterize the transaction as a sale rather than a loan. AgriCap did not *purchase* the account receivable but merely held it as collateral for the 80% loan and as collection agent. It therefore was not a purchaser for value, having never become owner of the receivable.

*Nickey Gregory Co.*, 597 F.3d at 606. *See also Endico Potatoes*, 67 F.3d at 1069 (lender holding security interest in PACA dealer's accounts receivable was not a bona fide purchaser for value so as to give it priority over PACA suppliers' claims).

V.

Comerica also argues that plaintiffs' claim is barred by the applicable statute of limitations. We review this question of law de novo. *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 242 (6th Cir. 2009). "Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Campbell v. Grand Trunk Western R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001).

The district court determined that this action is governed by Ohio Rev. Code § 2305.09, which provides for a four-year statute of limitations for the "recovery of personal property, or for taking or detaining it." *See OOIDA v. Comerica Bank*, 615 F. Supp. 2d at 698-701. On appeal, the parties do not dispute the applicability of this limitations statute.

In actions where there is no applicable federal statute of limitations, "[a]lthough state law sets the length of the statute of limitations, federal law establishes when the statute of limitations begins to run." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (citation and internal quotation marks omitted). "Under federal law, . . . the

limitations clock starts ticking when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Id*. (citation and internal quotation marks omitted). "[W]hether a plaintiff has exercised reasonable diligence is generally a factual question reserved for the jury [except when] the facts are so clear that reasonable minds cannot differ as to whether the plaintiffs exercised reasonable diligence." *Mest v. Cabot Corp*., 449 F.3d 502, 512 (3d Cir. 2006) (internal quotation marks and citation omitted).

Comerica argues that plaintiffs were on notice of their claim against Comerica no later than June 30, 1997, when they filed suit in the Arctic Litigation. Plaintiffs, on the other hand, maintain that because they did not learn of Comerica's involvement until December 2, 2003, during the bankruptcy proceedings, and brought suit in January 2004, their action is not time barred.

In its detailed analysis of the evidence pertaining to this issue, the district court found that settlement checks issued by Arctic to individual owner-operators, drawn on Comerica's account and dating back to 1992, contained information relating solely to the payment of net compensation and did not reveal any credit relationship between Arctic and Comerica. *OOIDA v. Comerica Bank*, 615 F. Supp. 2d at 700. Consequently, "[a]s the checks themselves do not reveal that Comerica was holding or using Plaintiffs' maintenance escrow funds, it is questionable whether these checks put Plaintiffs on notice that Comerica might have these funds." *Id*. at 701. The district court therefore concluded that "reasonable minds could differ as to whether Plaintiffs exercised reasonable diligence in discovering facts giving rise to the claim against Comerica" and "[i]t is for a jury to decide whether Plaintiffs should have known of the need for inquiry into Arctic's relationship with Comerica over four years before Plaintiffs brought this suit, and therefore whether Plaintiffs' claims are barred by the statute of limitations." *Id*.

Based upon this record, we agree with the district court that genuine issues of material fact exist which preclude a ruling, as a matter of law, on Comerica's statute of

limitations defense.  The district court correctly ruled that this is a question for the trier of fact to resolve.

## VI.

For the foregoing reasons, we affirm in part and reverse in part the district court's judgment and remand for further proceedings consistent with this opinion.